Augustus P. Loring & another, trustees, *vs.* Mary L.
Clapp & others
(and two companion cases[1]).

Norfolk.   January 8, 1958. — February 19, 1958.

Present: Wilkins, C.J., Ronan, Williams, Counihan, & Cutter, JJ.

*Devise and Legacy*, Intestacy, Construction of particular phrase, Re-
  mainder, Class, Gift to issue, Duplication of beneficiaries. *Trust,*
  Construction. *Evidence*, Extrinsic affecting writing. *Words*, "Issue
  per stirpes," "Legatees."

Construing as a whole a will stating that it disposed of "all" the testator's
  property and containing gifts to his wife outright, a gift to her of the
  life interest in a trust of the residue, and a provision that on her death
  the residuary trustees should pay over a stated substantial sum as she
  might appoint by will, "but, in default of any such appointment,
  . . . [should] pay over said . . . [sum], together with all the other
  principal of said trust," to the testator's issue, if any, otherwise to other
  relatives of his, the gift of "all the other [trust] principal" to his
  family was not dependent on his wife's failing to exercise her power of
  appointment but was to take effect in any event whether or not she
  exercised it, and a partial intestacy did not result from her exercising
  it. [60–61]
Under provisions of a will giving and appointing to the testator's wife a
  life interest in a residuary trust and in an inter vivos trust established
  by him, and on her death giving principal "one half to the issue then
  living, of . . . [a named maternal uncle of his] per stirpes . . . and
  the other half to the issue of . . . [his maternal] grandfather and
  grandmother . . . then living, per stirpes," each half of the principal
  constituted a separate gift with separate devolution, and, in the cir-
  cumstances, where the named uncle survived the testator and the
  testator's wife survived both by many years, the issue of the uncle
  living at her death were entitled not only to the half of principal given
  to them but also to share in the other half as issue of the testator's
  grandparents. [62, 64]
In the construction of a will it was proper, in the circumstances, to admit
  in evidence the will of the testator's mother which he had had in mind
  in preparing his own will. [63–64]

---

[1] The companion cases are Augustus P. Loring & another, trustees, *vs.*
Mary L. Clapp & others and G. Peabody Gardner & others, trustees, *vs.*
Mary L. Clapp & others.

Construing together a trust instrument giving the life interest to the settlor's wife and directing the trustees on her death to pay the principal to himself if living, otherwise "to the persons who were residuary legatees under . . . [his] will or their heirs in the same proportions as they took thereunder," and a subsequently executed will of the settlor giving the residue in trust to pay the income to his wife for life and on her death to pay a stated substantial sum from the principal as she might appoint by will and the rest of the principal to his issue or other relatives of his, where she survived him, the appointees under her will on her death were not entitled to share in the principal of the inter vivos trust. [68–69]

THREE PETITIONS filed in the Probate Court for the county of Norfolk on August 14, 1956.

The cases were heard by *Reynolds*, J.

*Roy M. Robinson*, stated the case.

*John E. Rogerson*, (*William N. Swift* with him,) for Cotter, administrator.

*Richard J. Cotter, Jr.*, for Cotter and another, trustees.

*Calvin P. Bartlett*, (*Samuel P. Newbury* with him,) for Augustus Gardner Means and others.

*Richard Wait*, (*Franklin Dexter* with him,) for Augustus P. Loring and others.

*Russell J. Coffin, Dudley A. Weiss, & James H. Brock*, for Mary L. Clapp, submitted a brief.

*Charles C. Cabot & John M. Woolsey, Jr.*, for St. Paul's School, submitted a brief.

CUTTER, J. These cases deal with three petitions for instructions, brought respectively by the trustees under the will of Francis Skinner, by the trustees under Skinner's indenture of November 24, 1911 (hereinafter called the 1911 trust), and by the trustees under Skinner's earlier indenture of March 20, 1899 (hereinafter called the 1899 trust). Skinner died on May 7, 1914, leaving a widow, Sarah E. Skinner (who later married one Shea and is hereinafter referred to as Mrs. Shea), but no issue surviving him.

The first sentence of Skinner's will states that it is a "testament of *all* the property of which I may die . . . possessed, or over which I may have any power, or to which I may be in any way entitled at the time of my

decease" (emphasis supplied). By clause Eleventh of this will Skinner appointed certain property over which he had powers of appointment under the will of his mother, Eliza B. Skinner.[2] By clause Twelfth of his will, Skinner appointed the income of the trust property held under the 1899 trust to his wife for life, and, upon her death, the principal of the trust fund to his issue "then living, in equal shares by right of representation, and in the absence of such issue, one half to the issue then living, of my uncle George Augustus Gardner per stirpes . . . and the other half to the issue of my grandfather and grandmother, Mr. and Mrs. John L. Gardner, then living per stirpes."

Skinner, by clause Fourteenth, left the residue of his estate to his trustees in trust to "pay the net income . . . to my wife for life, and on her death to pay . . . two hundred and fifty thousand . . . dollars of the principal . . . as she may appoint by will; but, in default of any such appointment, to pay over said two hundred and fifty thousand . . . dollars of the principal, together with all the other principal of said trust, to my issue then living in equal shares by right of representation, and in the absence of such issue, one half to the issue then living, of my uncle George Augustus Gardner per stirpes . . . and the other half to the issue of my grandfather and grandmother, Mr. and Mrs. John L. Gardner, then living, per stirpes."[3]

---

[2] This appointment was almost precisely in the language of the appointment by clause Twelfth of Skinner's will (mentioned in the text of this opinion) under the 1899 trust except that there was no prior gift to Skinner's widow, so that the appointees were determined and took at his death. See *Loring* v. *Gardner*, 221 Mass. 571, where the court considered one problem arising with respect to this appointment. This appointment was essentially in the words of the gifts in default of appointment found in Skinner's mother's will, articles Ninth, Tenth, Eleventh, and Twelfth. See also articles Thirteenth, Fourteenth, and Fifteenth. Article Seventeenth of her will provides, "The gifts herein made to the issue of . . . George Augustus Gardner are made by me as a token of my recognition of the services he has rendered me by the care and attention devoted to the charge of my property and affairs for many years, and to show my appreciation of those services."

[3] Skinner's widow took other benefits under his will. By clause Third, Skinner gave to his wife $250,000 "or if she do not survive me, then to her next of kin." By clause Fifth, he gave $300,000 in trust to pay the income to his widow during her life and at her death to pay the principal to a New Hampshire school. Clauses Second and Fourth gave her respectively certain tangible personal property and specific real estate.

The 1899 trust[4] reserved to Skinner the income of the trust property for life and a general power of appointment by will over the principal.  The 1911 trust gave the income to his wife for life (with power in the trustees to apply and to accumulate income) and directed the trustees after Mrs. Shea's death "to pay over the principal of said fund to me [Skinner], if . . . living, or if I have deceased, to . . . distribute the . . . [principal] to the persons who were residuary legatees under my will or their heirs in the same proportions as they took thereunder."

Mrs. Shea exercised "the power of appointment given to . . . [her] by the will of . . . Skinner" by appointing to trustees $250,000 for the benefit of relatives of her own. Her executors contend, on grounds discussed below, that there was an intestacy of all the residuary property disposed of under clause Fourteenth of Skinner's will apart from Mrs. Shea's life interest and the $250,000 appointed by her.  Her trustees contend that they are entitled to share in the trust property held under the 1911 trust on the ground that they, as appointees of Mrs. Shea, are in effect residuary legatees of Skinner under clause Fourteenth of his will and that they, therefore, come within the description of those who were to take the principal under the 1911 trust.

Issue of two deceased sons and one deceased daughter of Mr. and Mrs. John L. Gardner, Skinner's grandparents, were living in 1956 at the death of Mrs. Shea.  A further daughter of John L. Gardner was Skinner's mother, Eliza B. Skinner, who died in 1898, a few months before Skinner established the 1899 trust.  One deceased son who had issue living at Mrs. Shea's death was Skinner's uncle George Augustus Gardner who was living in 1914 when Skinner died but who died in 1916.  Those respondents (hereinafter for convenience called the George Gardner respondents) who were issue of George Augustus Gardner living at Mrs. Shea's death were thus not only within the description in

---

[4] The 1899 trust recites that Skinner was then "possessed of certain . . . property . . . which he believes it would have been agreeable to the wishes of his mother to have settled upon somewhat similar trusts [to those contained in his mother's will], and [that] he is desirous of complying with what he believes would have been the wishes of his mother."

clauses Twelfth and Fourteenth of Skinner's will of "the issue then living, of my uncle George Augustus Gardner" but also were within the description "issue of my grandfather and grandmother, Mr. and Mrs. John L. Gardner, then living," if these descriptions are to be given their literal meaning. The George Gardner respondents contend that (a) by Skinner's appointment by clause Twelfth of the property held under the 1899 trust, and (b) with respect to any property (after Mrs. Shea's life interest) passing in accordance with the ultimate gifts of clause Fourteenth of Skinner's will to persons other than Mrs. Shea's estate or trustees (hereinafter for convenience referred to as the ultimate gifts), they are entitled to share not only in the gift to issue of their ancestor, George Augustus Gardner, but also in the gift to the issue of their more remote ancestors, Mr. and Mrs. John L. Gardner, thus in effect taking a share in both halves of the ultimate gifts as contrasted with those respondents (hereinafter for convenience called the Joseph-Julia respondents) who are issue of Mr. and Mrs. John L. Gardner (but not of George Augustus Gardner) by descent either from Joseph P. Gardner or from Julia Coolidge, each of whom was a child of Mr. and Mrs. John L. Gardner. The Joseph-Julia respondents contend that the George Gardner respondents take only the various gifts made by clauses Twelfth and Fourteenth and under the 1911 trust to the issue of George Augustus Gardner and do not share in the gifts to the issue of Mr. and Mrs. John L. Gardner.

The trustees under Skinner's will in their petition ask to be instructed "to whom and in what proportions" they should "distribute . . . the trust fund under clause Fourteenth . . . which remains after . . . [they] have deducted . . . all taxes and expenses properly payable therefrom and also the $250,000 over which . . . [Mrs.] Shea had and exercised a . . . power of appointment."[5] The

---

[5] There were various requests for instructions with respect to the source of payment of certain legacy taxes, which need not be considered here, because no longer in dispute. The appellants do not appear to argue in their briefs that the Probate Court's decree on these requests was erroneous and it was stated at the oral argument that this aspect of the decree was no longer in controversy. See Rule 13 of the Rules for the Regulation of Practice before the Full Court (1952), 328 Mass. 698.

trustees under the 1911 trust and the trustees under the 1899 trust similarly sought to be advised in what proportions and to what persons they should distribute the principal of their respective trust estates after deducting taxes and expenses.

The decree of the Probate Court with reference to clause Fourteenth in effect determined that there was no intestacy under that clause. That decree and the decrees with respect to the 1899 and 1911 trusts instructed the trustees that the George Gardner respondents were entitled to share both in the gift to the issue of George Augustus Gardner and in the gift to the issue of Mr. and Mrs. John L. Gardner. The court directed distribution of each of the trust funds, one half to the George Gardner respondents (claiming per stirpes as of the date of Mrs. Shea's death as issue of George Augustus Gardner) and one half to the issue per stirpes of Mr. and Mrs. John L. Gardner (including both the George Gardner respondents and the Joseph-Julia respondents) living at Mrs. Shea's death. The specified fractions need not be stated here. The decree with respect to the 1911 trust necessarily involved a determination that no part of its principal was to go to the persons to whom Mrs. Shea appointed the property over which she had a power of appointment under clause Fourteenth of Skinner's will.

The administrator with the will annexed of Mrs. Shea's estate (see, however, footnote 7, *infra*) and the Joseph-Julia respondents appealed from all three decrees. The trustees under Mrs. Shea's will also appealed from the decrees with reference to the trust under clause Fourteenth and to the 1911 trust.

1. The administrator of Mrs. Shea's estate argues that the ultimate gifts over after Mrs. Shea's death in clause Fourteenth to the George Gardner respondents and the Joseph-Julia respondents were limited upon a contingency which did not occur. The contention (a) rests upon the language (already quoted) referring to the ultimate gifts, "but, in default of any such appointment [of $250,000], to pay over said two hundred and fifty thousand . . . dollars of

the principal, together with all the other principal of said trust, to . . . [the persons named in the ultimate gifts,]'' and (b) in effect is that the ultimate gifts are expressly dependent upon a default in Mrs. Shea's exercise of her power over $250,000 and fail because she did exercise that power.

(a) The first sentence of Skinner's will declared that he was dealing with "all the property . . . to which . . . [he might] be in any way entitled at" his death. This declaration is supported by the general principle (see *Old Colony Trust Co.* v. *Treadwell,* 312 Mass. 214, 216; *Langlois* v. *Langlois,* 326 Mass. 85, 87; *Balcom* v. *Balcom,* 333 Mass. 599, 601; *Second Bank-State Street Trust Co.* v. *Second Bank-State Street Trust Co.* 335 Mass. 407, 414–415) that a construction resulting in partial intestacy is not to be adopted unless plainly required.

(b) We look at the will as a whole to ascertain the intent of the testator. See *Knowlton* v. *Forbush,* 322 Mass. 703, 704; *Balcom* v. *Balcom,* 333 Mass. 599, 601. Skinner gave to his wife certain property outright (see footnote 3, *supra*) and for her life the income of all the other property of which he could so dispose,[6] apart from the amounts of some relatively small cash legacies. He gave to her the power to appoint $250,000 of the principal under clause Fourteenth. There is no indication anywhere in his will of any intention on Skinner's part that his wife's next of kin or appointees should share in his estate, except (1) in clause Third (where he provided that if his wife predeceased him the legacy under that clause was to go to her next of kin; see footnote 3, *supra*) and (2) with respect to the general power to appoint $250,000, just mentioned. He obviously tried to look after his wife for her life as fully as possible. To the extent, however, that he intended that her relatives should take any part of his estate or that she should be able to govern the

[6] The special powers of appointment which he possessed under his mother's will were limited to appointments to the issue of his grandparents. No weight, therefore, can be given to the fact that no appointment to his wife was made by clause Eleventh.

disposition of his estate after her death, the provisions of clause Third and of the $250,000 power show that he could express that intention affirmatively. The power that he gave her over $250,000 also tends to indicate that he did not intend that she should have any other interest (apart from her life interest) in the residue. *Warren* v. *Sears*, 303 Mass. 578, 582–583. *Commissioner of Corporations & Taxation* v. *Baker*, 303 Mass. 606, 612. By contrast, there is the provision, recurring in clauses Eleventh, Twelfth, and Fourteenth, for the issue of his grandparents and the issue of his uncle, showing in the aggregate a strong intention to make them principal objects of his bounty.

Reading the whole will leads us to conclude that Skinner intended that all his property, not affirmatively and expressly placed at his wife's complete disposal, was to go after her death to his issue then living, if any, and otherwise in accordance with the ultimate gifts. This is apparent from the general scheme of his will. Even without the evidence of intention which has been mentioned, it would be "unreasonable to assume" that a testator intends to benefit his wife's relatives while there are blood relatives of his own, who, throughout his will, have been named consistently as the ultimate objects of his bounty, except where he affirmatively shows that he has such an intention. See *Calder* v. *Bryant*, 282 Mass. 231, 236; Am. Law of Property, § 21.3, at pages 131–132.

(c) Where the intention of a testator can be ascertained, even if there is some failure "by express and formal words" to carry out that intention, "the court must supply the defect by implication, and so mould the language of the testator as to carry into effect, as far as possible, the intention which it is of opinion that he has on the whole will sufficiently declared." *Metcalf* v. *First Parish in Framingham*, 128 Mass. 370, 374. *Balcom* v. *Balcom*, 333 Mass. 599, 601–602.

In the present case no implication of words in clause Fourteenth seems necessary. However, it would be abundantly justified, if doubt existed about Skinner's meaning.

The disputed words "in default of any such appointment" obviously have reference only to the $250,000 over which the power of appointment existed. There is no rational reason for construing a failure to exercise the power as a condition precedent to the validity of the ultimate gifts made later in the clause. She would, on such a construction, take a large part of the balance by intestacy if she survived Skinner and exercised her power. It is unlikely that Skinner intended that the beneficiaries of the ultimate gifts were to take those gifts if his wife made no appointment of the $250,000 but that, if she did appoint, by that very act she also obtained complete testamentary control over about half the remaining trust property, even though there is not a word affirmatively showing any such intention in the clause itself. The words "*together* with all the *other* principal of said trust" (emphasis supplied) sufficiently indicate that the ultimate gifts of this other principal were to take effect regardless of whether Mrs. Shea made an appointment, a consideration wholly irrelevant to such other property. Although the language is unhappy, any defect is purely formal. The scrivener's grammatical lapses should not be permitted to defeat the intention apparent from the will as a whole (see *Miller* v. *Parish of the Epiphany, Winchester,* 302 Mass. 323, 326; Page, Wills (3d ed.) § 936) that the crucial provision ("together with all the other principal of said trust") of clause Fourteenth really means "and in any event, regardless of whether there is any such appointment, all the other principal of said trust." There is in this will indication of intention, which this court did not find in cases like *Springfield Safe Deposit & Trust Co.* v. *Dwelly,* 219 Mass. 65, 69–70, *Bailey* v. *Bailey,* 236 Mass. 244, 246–247, and *Shea* v. *Maitland,* 237 Mass. 221, 225–226. The probate judge correctly held that there was no intestacy in clause Fourteenth.

2. We next consider the ultimate gifts in clause Fourteenth and the almost identical gifts (for convenience also referred to in this part of this opinion by the term "ultimate gifts") in clause Twelfth made by exercising the power of

appointment under the 1899 trust.[7]   The property given is
divided in each instance into two independent parts: "one
half to the issue then living, of my uncle George . . .
Gardner per stirpes . . . and the other half to the issue of
my grandfather and grandmother, Mr. and Mrs. John L.
Gardner, then living, per stirpes."   We think that these were
severed, separate gifts or shares "with the devolution of
. . . [each] share to be dealt with separately from the
devolution of the other shares."   See analogy of *Second
Bank-State Street Trust Co.* v. *Second Bank-State Street Trust
Co.* 335 Mass. 407, 412.   Treating these as separate gifts, it
is easy and natural to apply the words used, with their nor-
mal, precise, literal, legal meaning, to the facts at Mrs. Shea's
death, as did the Probate Court.   If, however, the partial
duplication of donees which existed at Mrs. Shea's death is
regarded as creating an ambiguity (latent or otherwise),
then nothing in the will or in its background calls for a
different conclusion, despite the contention of the Joseph-
Julia respondents that Skinner could not have intended
the George Gardner respondents to share in both halves of
the ultimate gifts simply because they were not only issue
of George Augustus Gardner but also issue of Mr. and
Mrs. John L. Gardner.

Skinner obviously used (see footnote 2, *supra*) as a prece-
dent for the language of these ultimate gifts [8] the similar
language found in several articles of his mother's will made
in 1891.   He presumably intended the provision to have the
same meaning which it did in his mother's will.   In 1891 or
when she died in 1898 there would have been no duplica-
tion in the donees of the two halves of the comparable gifts
in her will, if they had taken effect at any time prior to the
death of her brother (and Skinner's uncle) George Augustus

---

[7] Mrs. Shea's administrator originally contended that this power of ap-
pointment was not exercised by clause Twelfth.   That contention was waived
in his brief and the administrator's appeal from the decree with respect to
the 1899 trust is not pressed.

[8] With, of course, minor appropriate variations, such as references to
George Augustus Gardner as his uncle and to Mr. and Mrs. John L. Gardner
as his grandparents, rather than, as in his mother's will, to them respectively,
as her brother and her parents.

Gardner in 1916. He, of course, could not be included in a class defined as consisting of his own issue, so he would have participated only in the second half of Mrs. Skinner's gifts, comparable to the ultimate gifts, as one of the issue of his own parents. George Augustus Gardner's four then living children would then have taken the first half of each such gift under the circumstances then existing. Skinner's mother formally explained (see footnote 2, *supra*) in her will that the extra gift to her brother's issue was made in special recognition by her of his great services to her.

There would still have been no duplication of donees under the ultimate gifts in Skinner's will if they had taken effect in 1914 when Skinner died. Although George Augustus Gardner was then a very old man, he was still alive and his issue, per stirpes, then living were his same four children (as in 1898). It was more probable, than in 1898, of course, that a duplication would soon develop, and Skinner might well have foreseen that controversy could arise when and if facts changed so that there would be a duplication of donees. However, it is entirely possible that Skinner, in taking over from his mother's will the language of the ultimate gifts, and their meaning, at the same time took over the reason[9] for making them, for, as has been seen, he exhibited in the 1899 trust (see footnote 4, *supra*) that he was "desirous of complying with what he believe[d] . . . would have been the wishes of his mother."

Here, it is certain that Skinner, when he was preparing his own will, had his mother's will in mind, for he exercised by clause Eleventh powers of appointment contained in it. The probate judge correctly admitted (over the objection of the Joseph-Julia respondents) the mother's will in evidence, as an aid to resolving any ambiguity which might exist. It

[9] The record and documents show further possible reasons for Skinner's preference for the George Gardner line. George Augustus Gardner and his son had been executors of his mother's will. They had been named trustees under the 1899 trust. George Augustus Gardner's son and grandson were named executors of Skinner's will. The only member of the family given a specific legacy was Olga Monks, daughter of George Augustus Gardner. A reasonable inference is that as trusted advisers and relatives they were closer to him than the other lines of issue of Mr. and Mrs. John L. Gardner.

was part of the background against which Skinner made his
testamentary dispositions. *Gray* v. *McCausland,* 314 Mass.
743, 745–748. *Boston Safe Deposit & Trust Co.* v. *Lewis,*
317 Mass. 137, 144. See Restatement: Property, § 242,
comment i; Newhall, Settlement of Estates (3d ed.) § 312;
Wigmore, Evidence (3d ed.) § 2470. Compare *Agricultural
National Bank* v. *Schwartz,* 325 Mass. 443, 448 (where no
ambiguity was held to exist).

Since (a) we look upon the two halves of the ultimate
gifts as separate, and (b) there would have been no duplica-
tion between the gifts made of the first half and of the second
half at the date of Skinner's death, and (c) the intention of
the gifts seems to be consistent with their language in the
light of the background, we regard as irrelevant the duplica-
tion of donees which would have taken place at Mrs. Shea's
death at any time after the death of George Augustus
Gardner in 1916. Certainly the meaning of the ultimate
gifts could not change after Skinner's death.

The Joseph-Julia respondents rely largely on authori-
ties indicating that, where there is a single class gift to two
groups and the same person satisfies the description of both
groups, that person participates only once in the class gift
and does not take a double share. See, for example, Re-
statement: Property, § 301, comment e (relating not as in
the case before us to gifts to "issue per stirpes," a term
which, in the absence of special circumstances not here
present, has a very precise family meaning, but to gifts "to
children," nieces, and the like), § 305, comment w, illustra-
tion 12 (relating to gifts to "heirs," a word much more sus-
ceptible of variations in usage and vagueness of meaning
than the term "issue per stirpes"). These authorities seem
to us to have no application to a case like the present where,
as we view the ultimate gifts, there were two distinct class
gifts and not merely one, and where all indications of actual
intent are consistent with giving the ultimate gifts their
literal meaning.

The Massachusetts decisions relied upon by the Joseph-
Julia respondents are distinguishable from the present situa-

tion. *Calder* v. *Bryant*, 282 Mass. 231, 233, 235, rests largely on a provision indicating that a wife and a daughter given life interests only were not to compete with a son given an interest in remainder expressly stated to be vested. *Jones* v. *Gane*, 205 Mass. 37, 45, and *Lamb* v. *Jordan*, 233 Mass. 335, 338–340, construed provisions much more ambiguous than that here involved and rest largely upon the general intention indicated by other provisions of the particular wills and the attendant circumstances. *Baxter* v. *Baxter*, 122 Mass. 87, 89, merely refused to permit a clear general intention for an equal division (into sevenths) of a general fund to be defeated by the ambiguity of the provision (which, by a forced construction, could have been said to provide for an extra share to the recipient) directing that one seventh be held in trust. *Old Colony Trust Co.* v. *Cleveland*, 291 Mass. 380, 381–383, rests upon its peculiar facts.[10]

The cases from other jurisdictions relied on by these respondents (see *Mitchell* v. *Vest*, 157 Iowa, 336; *Wilberding* v. *Miller*, 90 Ohio St. 28; *In re Irish's Will*, 89 Vt. 56 [11])

[10] Its result was influenced by a legal principle there expressed (but not here involved) with respect to testamentary gifts to revocable, amendable trusts, later amended, which may be inconsistent with present legal thought. Restatement 2nd: Trusts (Tentative Draft, April 1, 1955) § 54, comment i, and reporter's note at page 173; Scott, Trusts (2d ed.) § 54.3, at pages 372–377. In any event it was not a case where there was a clear direction, as here, that donees share as members of two separate classes and the testamentary gifts which there took effect were clearly not intended to duplicate gifts (fixed in amount and already satisfied) under an inter vivos trust into which funds were poured over under the will there discussed.

[11] *In re Irish's Will* superficially resembles the present case. A testator on his death bed left property in trust for his three year old granddaughter (his then heir apparent and, on his death a few days later, his sole heir) in one clause for terms of years and then outright and in another clause for her life and upon her death, *without surviving issue* (under the former clause before becoming entitled to the fund and under the latter at any time), the principal one half to her lawful heirs and one half to his lawful heirs. The granddaughter's then heir apparent was her father, who was not an heir of the testator. Another trust fund was left to the testator's mother for life with remainder one half to his granddaughter and her heirs and the other half to "my lawful heirs." The court found in the first two gifts mentioned above (not then before it for consideration) which were to take effect in all probability only in the event that there was a complete failure of the testator's issue, and in the surrounding circumstances, sufficient indication that by the phrase "my lawful heirs" he meant those who would be his heirs if there had been no issue surviving him. There were thus special facts leading to the result in that case.

seem to us distinguishable either on their facts or on the general intent exhibited by the particular instrument under consideration.

3. The trustees under Mrs. Shea's will contend that they (as appointees of the $250,000 which she was given power to appoint by clause Fourteenth of Skinner's will) are entitled to participate in the 1911 trust corpus. They rely upon the provision in that trust that the corpus, at Mrs. Shea's death, was to go to the "persons who were residuary legatees under my will or their heirs in the same proportions as they took thereunder." The record shows no indication of any will of Skinner's in existence at the time of the execution of the 1911 trust.

Cases like *Bemis* v. *Fletcher*, 251 Mass. 178, incorporating by reference the provisions of an existing document, or *Old Colony Trust Co.* v. *Stetson*, 326 Mass. 641, 643, dealing with incorporating certain provisions of another paragraph of the same instrument, are not directly controlling. Compare also *Old Colony Trust Co.* v. *Rhodes*, 299 Mass. 390, 396. If the 1911 trust intended any incorporation by reference, it was obviously of the terms of some later instrument. Skinner in 1911 may well have had in mind leaving the residue of his estate to named persons, for the language quoted above would have been more appropriate if he had made that type of disposition. The disposition which he did make of his residue, however, does not fit in well with any theory that the provisions of clause Fourteenth were to be incorporated into the provisions of any separate trust.

The most obvious and simple explanation of Skinner's words would be that he was merely postponing the disposition of the remainder interests under the 1911 trust, by saying, in an awkward way, that he wanted the 1911 trust corpus (after his wife's life estate) dealt with (if she should survive him) as part of the residue of his estate, by a pour over arrangement. On this theory, in substance Skinner reserved to himself the power to appoint the remainder interest in the 1911 trust corpus as a part of the residue.

The effect of treating the trustees under the clause Fourteenth trust, in their trust capacity, as the "legatees" (compare *Matter of Landon,* 182 Misc. [N. Y.] 84, 88, where such a result was held inconsistent with the language of the particular will there involved as well as violative of the applicable rule against perpetuities) would be to add the 1911 trust corpus to the trust of the residue. If Skinner had survived his wife, the express reversion to him would have been dealt with precisely in this manner as part of the residue of his estate dealt with by clause Fourteenth. If the remainder interests under the 1911 trust should be held to fail because of the obscurity of the stated remainders after the wife's life estate, the result would be the same. The property accruing to his estate as a consequence of the failure of the trust (see Restatement: Trusts, § 411, comments c, h, i; Scott, Trusts [2d ed.] § 411.2) would fall into the residue of his estate.

Even if Skinner in the 1911 trust intended a reference over in some manner to clause Fourteenth of his will to determine the persons taking beneficially as "legatees," the general framework of the trust and the will does not indicate that Skinner intended that Mrs. Shea's appointees are to be regarded as "legatees" under clause Fourteenth. That clause fixed a limit of $250,000 on the amount which those appointees were to receive. There is in the 1911 trust and in the will no suggestion of any intention that this sum was to be duplicated or augmented in any way. Of course, when the will was made in 1913, Skinner knew of the provisions of the 1911 trust. If he had intended that his wife, in addition to her income interest for life in the 1911 trust corpus (carefully hedged about as it was by provisions against anticipation and by a power in the trustees to apply and accumulate income), was to have some power to dispose of the 1911 trust corpus, it would have been natural for him to have said so in clause Fourteenth affirmatively and in a way which would clearly override his frequently reiterated intention to benefit the issue of his Gardner grandparents and the issue of his uncle. As has been noted, he has shown

by clause Third (with reference to the cash legacy to Mrs. Shea and to her next of kin, if he survived her) and in the power of appointment given to her by clause Fourteenth, that he knew how to state affirmatively a wish that his wife or her relatives should benefit.

This court in *Loring* v. *Gardner,* 221 Mass. 571, 573, has already held that Skinner did not include the appointments, by his exercise in clause Eleventh of the powers which he had under his mother's will, within the term "legacies" in clause Thirteenth (which provided that the "legacies hereinbefore given, [were] to be paid in full to the various legatees without deduction for legacy taxes"). This decision has some tendency to support the view that Mrs. Shea's appointees under clause Fourteenth were not within the term "legatees" as used in the 1911 trust. This view is also supported by the reference (in the language already quoted from the 1911 trust) to the "persons who *were* residuary legatees under . . . [his] will or their heirs in the same proportions as they *took thereunder*" (emphasis supplied). If it had been intended to include as "legatees" Mrs. Shea's possible future appointees by a will which took effect in 1956, forty-five years after the execution of the 1911 trust and forty-two years after Skinner's death, it would have been natural to use a form of words referring to the future rather than to the past. The words used, referring to the past, and the word "thereunder" have some tendency to indicate that the "legatees" were to be determined at least by class in the residuary article (clause Fourteenth) in Skinner's will, and were not persons who could only be determined by reference to some future will of Mrs. Shea.

All the contentions affecting this obscure provision of the 1911 trust (the ambiguity in which is not clarified by anything said in *Gray* v. *Whittemore,* 192 Mass. 367, 380–384, upon which the trustees under Mrs. Shea's will appear to rely) have been considered. We conclude that Skinner intended that the trust corpus of the 1911 trust (after Mrs. Shea's life interest) should be added to, and disposed of as a part of, the residue of his estate (see *Smith* v. *Shanahan,*

314 Mass. 329, 334–335) without any duplication of the $250,000 over which Mrs. Shea had a power of appointment or any duplication of the payments in any event to be made from the residue (see *Old Colony Trust Co.* v. *Cleveland,* 291 Mass. 380, 382) to her appointees. The probate judge correctly decided that the 1911 trust corpus should be distributed one half to the issue (living at Mrs. Shea's death) of George Augustus Gardner, per stirpes, and one half to the then living issue, per stirpes (including the George Gardner respondents), of Mr. and Mrs. John L. Gardner.

4. The several decrees are affirmed. Costs and expenses of all parties to each of these appeals are to be allowed in the discretion of the Probate Court.

*So ordered.*