JOHN E. NICKOLS & others *vs.* COMMISSIONERS OF
MIDDLESEX COUNTY
(and a companion case[1]).

Middlesex.    March 11, 1960. — May 3, 1960.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE,
& CUTTER, JJ.

*Walden Pond State Reservation. Trust,* Public trust, Charitable trust. *Charity. Equity Jurisdiction,* Public trust, Charitable trust. *Mandamus. Public Officer. Deed,* Construction. *Attorney General. Evidence,* Judicial notice.

Gifts of lands on the shores of Walden Pond for the Walden Pond State Reservation, made by deeds running to the Commonwealth and accepted by the commissioners of Middlesex County under St. 1922, c. 499, § 1, were accepted by the commissioners as officers acting in behalf of the Commonwealth and were made to it, not to any subdivision of it, and taxpayers of Middlesex County could not maintain a suit in equity under G. L. c. 214, § 3 (11), to enforce the purposes of the gifts. [17]

A suit by citizens to enforce a public trust could not be maintained under the general equity jurisdiction unless the Attorney General either intervened or granted to the plaintiffs authority to prosecute the suit in his name. [17–18]

Citizens had standing to enforce by mandamus the public duty of the commissioners of Middlesex County acting as the Walden Pond State Reservation Commission under St. 1922, c. 499, to observe any trust or obligation imposed by deeds of gift of lands on the shores of Walden Pond for the Reservation. [18]

Discussion of the creation of a public trust or obligation to use for a particular purpose property conveyed to a governmental body. [18–19]

This court took judicial notice of Thoreau's book "Walden." [22]

Deeds of gift to the Commonwealth of lands comprising almost all the shores of historic Walden Pond, "an American literary shrine," given and accepted under St. 1922, c. 499, in 1922 when the pond was still essentially in its natural state as a beautiful, secluded "forest lake" in a

---

[1] Eleanor T. Moore & others *vs.* Commissioners of Walden Pond State Reservation & others. Statute 1922, c. 499, § 2, provided that for purposes of that act the county commissioners should "be known as the Walden pond state reservation commission."

rural area, and providing that the granted lands were "subject to the restriction and condition" that they should not be used for certain stated amusement activities commonly carried on at beach resorts, "it being the sole and exclusive purpose of . . . [the conveyances] to aid the Commonwealth in preserving the Walden of Emerson and Thoreau, its shores and nearby woodlands for the public who wish to enjoy the [p]ond, the woods and nature, including bathing, boating, fishing and picnicking," were construed as imposing a predominant public trust or obligation to preserve the pond area in its natural state so far as practicable and yet as authorizing "bathing, boating, fishing, and picnicking," and provision of facilities therefor, of a nature and in a manner consistent with such primary objective of the donors.   [23–24]

Certain acts or proposed acts of the Walden Pond State Reservation Commission, such as cutting of many large trees, taking fill from the slopes above the pond for enlargement of the beach, and construction of a concrete bath house close to the beach, were or would be contrary to a public trust or obligation, imposed by donors of lands comprising almost all the shores of the pond to the Commonwealth, to preserve the pond area in its natural state so far as practicable; and in a mandamus proceeding by citizens against the commission the writ should issue commanding in general terms that the respondent refrain from further violation of such public trust or obligation and take steps designed to reduce damage already done to the area.   [25–27]

BILL IN EQUITY filed in the Superior Court on September 13, 1957.

PETITION for a writ of mandamus filed in the Superior Court on October 8, 1957.

In the suit in equity, following confirmation of a master's report, a decree dismissing the bill was entered by *R. Sullivan*, J., and the plaintiffs appealed.   Following the report of an auditor, the mandamus proceeding was reported by *Forte*, J., without decision.

*Frederick G. Fisher, Jr.,* for the plaintiffs and petitioners.

*William F. Dierkes,* for the defendants and respondents.

CUTTER, J.   Statute 1922, c. 499, established the Walden Pond State Reservation.   Section 1 authorized the commissioners of the county of Middlesex to take by gift land near the pond, "title to . . . be . . . in the commonwealth . . . subject to such restrictions and conditions as may be imposed under deeds of gift."   Section 3[2] gave to the com-

2 Section 3 was amended by St. 1946, c. 50, to permit the commission to appoint police officers.   Statute 1949, c. 20, § 1, authorized the commission to make parking regulations to be enforced by its police officers.   Statute 1925, c. 26, § 1, inserted in the 1922 act § 3A, permitting the commission to establish

missioners "full . . . authority to . . . maintain the . . . reservation in behalf of the commonwealth." Certain tax support was authorized. By deeds recorded on June 9, 1922, donors in the Emerson and Heywood families gave to the Commonwealth land (the Emerson and Heywood grants) constituting all the shores of the pond except a strip abutting the right of way of the Boston and Maine Railroad. These deeds each provided that the "parcels are . . . subject to the restriction and condition that no part of the premises shall be used for games, athletic contests, racing, baseball, football, motion pictures, dancing, camping, hunting, trapping, shooting, making fires in the open, shows or other amusements such as are often maintained at or near Revere Beach and other similar resorts, it being the sole and exclusive purpose of this conveyance to aid the Commonwealth in preserving the Walden of Emerson and Thoreau, its shores and nearby woodlands for the public who wish to enjoy the [p]ond, the woods and nature, including bathing, boating, fishing and picnicking."[3] In 1927, the railroad, by a deed without any restrictions, conveyed the shore near its location to the Commonwealth. Thereafter there were various developments of the area, described more fully in the margin.[4]

"rules and regulations for the government and use of the . . . reservation." Section 3A was amended by St. 1945, c. 123, § 1, to permit the application of such rules to "the waters of Walden pond . . . and . . . [their] use . . . for" boating and bathing. The regulations (§ 2) were not to prohibit daytime fishing in the spring months, or the use of "boats propelled by muscular power," except from the public bathing beach. The commission was given authority "to regulate the use of outboard motors and sail and motor boats."

[3] These deeds each also contained the following further provision: "And subject further to the restriction and condition that no part of the premises shall be placed under the control of the Metropolitan District Commission or become a part of the Metropolitan District; and that the grantors shall have the right to cut and remove firewood for use in their homes during their respective lives."

[4] Statute 1925, c. 163, authorizing acquisition of the railroad land, was followed (a) by St. 1947, c. 389, authorizing the commission (§ 1) to acquire land for additional toilets and a sewage disposal system and (§ 2) to borrow money for the purpose; (b) by St. 1948, c. 18, increasing such permitted expenditure and borrowing; (c) by St. 1949, c. 17, authorizing expenditure of $25,000 for "additional beach facilities"; and (d) by St. 1957, c. 380, § 1, authorizing "additional beach facilities and improvements" and the expenditure from "any available funds" of $50,000, to be included in the 1957 county appropriations.

Public bathing in the pond has greatly increased in recent years. Until 1957 bathing was limited to the beach at the easterly end, "a water frontage of about 1,600 feet." Under St. 1957, c. 380, § 1 (see footnote 4, *supra*), the commissioners carried out substantial extensions of the existing beach and, to do this, cut over one hundred large trees and nearby undergrowth. These trees, "for the most part, things of great beauty, and . . . mature growth," might "have endured as beautiful trees for many years." The commissioners also (a) planned to build a paved concrete ramp or ramps from an existing parking area to the beach; (b) widened the beach, from a width of eight to ten feet to one of fifty feet, "by cutting down the embankment" on the pond shore from a "grade of about four-to-one, to a grade of about two-to-one, and using the excavated material to fill in the pond [under water] for a distance of eighty-five or ninety feet out from the then existing water's edge"; (c) built additional parking spaces involving substantial cutting of trees and provided access to the pond by a road for fishermen; and (d) planned to build a concrete bath house about one hundred feet long "at the bottom of the slope close to the new beach," which already has involved the cutting of about twenty-five substantial trees.

Upon the commencement of this work on June 15, 1957, "[m]any persons in . . . Concord and Lincoln were disturbed." A committee was formed "to protest . . . what they regarded as a violation of the restrictions . . . in the deeds of gift and the destruction of much of the [reservation's] beauty."

On September 13, 1957, a group of taxpayers residing in the county filed a bill in equity, purporting to act under G. L. c. 214, § 3 (11),[5] (a) to enjoin the commissioners from

---

[5] Section 3 provides for "jurisdiction in equity of the following cases: . . . (11) [inserted by St. 1929, c. 126, § 1] Suits to enforce the . . . purposes of any gift or conveyance . . . made to and accepted by any county, city, town or other subdivision of the commonwealth for . . . specific . . . purposes in trust or otherwise . . . . Such a suit shall be commenced only on petition of the attorney general or, by leave of court, on petition of ten taxpayers of such county, city, town or other subdivision. . . . [T]he attorney general shall be served with notice of the preliminary petition [of ten taxpayers] . . . and may intervene . . . at any stage . . . ."

"altering or destroying the shores and nearby woodlands of . . . [the pond] by the erection of bath houses and the construction of paved roadways to the shore" and (b) to require them "to preserve the shores and nearby woodlands . . . and to observe the . . . purposes of the gifts and conveyances." The commissioners' demurrer was overruled. The case was heard by a master together with the mandamus proceeding (described below) in which he was appointed auditor. His thorough report (in most respects the same as his report as auditor) was confirmed. By final decree the bill was dismissed. The taxpayers have appealed.

On October 8, 1957, four citizens and residents of Concord filed a petition for a writ of mandamus, alleging certain facts already stated. They sought a writ commanding the commissioners to observe the terms of the deeds and to refrain from conduct in violation of those deeds. The commissioners' demurrer was overruled. After a report from the auditor, to which there were no objections, the trial judge reported the case, without decision, upon the pleadings and the auditor's report. The facts stated are based upon the auditor's report.

1. General Laws c. 214, § 3 (11), see footnote 5, *supra,* permits a bill to enforce the "purposes of any gift . . . *to* and accepted by *any county, city, town, or other subdivision* of the commonwealth" (emphasis supplied). The Emerson and Heywood grants were to the Commonwealth and not to a State subdivision. Although St. 1922, c. 499, § 1, authorized the commissioners to accept the gift, title was to "remain in the commonwealth." In their acceptance (see *Bianco* v. *Lay,* 313 Mass. 444, 447–448; *City Bank Farmers Trust Co.* v. *Carpenter,* 319 Mass. 78, 79–80) the commissioners acted as State officers under the 1922 statute. The taxpayers cannot proceed against the State or its officers under § 3 (11). The bill sets out no basis for relief under the general equity jurisdiction (G. L. c. 214, § 1, as amended by St. 1935, c. 407, § 2), for this is a suit in which the Attorney General is not the plaintiff or an intervener. Neither

has he authorized the taxpayers as relators to prosecute a suit in his name to enforce a public trust. See G. L. c. 12, §§ 7, 8; *Ames* v. *Attorney Gen.* 332 Mass. 246, 250–251. Cf. *Briggs* v. *Merchants Natl. Bank,* 323 Mass. 261, 281.

2. The petitioners have standing as citizens by mandamus to "enforce a public duty of interest to citizens generally." *Pilgrim Real Estate, Inc.* v. *Superintendent of Police of Boston,* 330 Mass. 250, 251. *Concord* v. *Attorney Gen.* 336 Mass. 17, 26–28. See *Sears* v. *Treasurer & Recr. Gen.* 327 Mass. 310, 314–315; *Atherton* v. *Selectmen of Bourne,* 337 Mass. 250, 257; *Dodge* v. *Inspector of Bldgs. of Newburyport,* 340 Mass. 382, 385. The question for decision is whether the commissioners are under a public duty, because of the deeds, their acceptance, and St. 1922, c. 499, § 1, and other statutes relating to the reservation, to act otherwise than in the manner in which they have acted and propose to act.

3. The commissioners contend that the statement of purpose in the deeds is not a restriction, condition, trust, obligation, or burden with respect to the granted property. They further contend that the purpose was not to preserve the pond and nearby woodlands in their natural state.

Property conveyed to a governmental body, a corporation, or trustees for particular public purposes may be subject to an enforceable general public obligation or trust to use the property for those purposes. See *Howe* v. *Lowell,* 171 Mass. 575, 577, 584; *Codman* v. *Crocker,* 203 Mass. 146, 150 ("where property is dedicated . . . to a public use for a particular purpose, it cannot . . . without the exercise of . . . eminent domain, be . . . [put] to a use of a different character, in disregard of the trust . . . and . . . the rights of the donors"); *City Bank Farmers Trust Co.* v. *Carpenter,* 319 Mass. 78, 80. See also *Amory* v. *Amherst College,* 229 Mass. 374, 383–385; *Temple* v. *Russell,* 251 Mass. 231, 235–237; *Wellesley College* v. *Attorney Gen.* 313 Mass. 722, 724; and the analogy of the rule by which contracts are interpreted to carry out the principal purpose of the parties, *King Features Syndicate, Inc.* v. *Cape Cod*

*Bdcst. Co. Inc.* 317 Mass. 652, 654; *Spaulding* v. *Morse,* 322 Mass. 149, 152–153; *Lowell* v. *Boston,* 322 Mass. 709, 715 (but cf. 729–731, 739–740); Corbin, Contracts, §§ 545, 547; Restatement 2d: Trusts, § 11, comments c, d, §§ 25, 95, 374, 378; Scott, Trusts (2d ed.) §§ 11, 25, 95, 374, 374.10, 378. If a trust or obligation was intended, it has been accepted by St. 1922, c. 499, and, accordingly, the commissioners, as the public officers administering that trust, may be required by mandamus to perform their public duty under it.

Other cases have held that, in particular circumstances, no trust, obligation, restriction, or condition was created, but that the grantor's intention (or the result of the words he used) was merely to state a motive or precatory direction. See *Rawson* v. *School Dist. in Uxbridge,* 7 Allen, 125, 129–131; *Drury* v. *Natick,* 10 Allen, 169, 183; *Barker* v. *Barrows,* 138 Mass. 578, 580; *Loomis* v. *Boston,* 331 Mass. 129, 132 (in the particular circumstances, land, not shown to have been a gift, conveyed to the city "for the purposes of a public park" was held not subject to any enforceable trust). See also *Dickson* v. *United States,* 125 Mass. 311, 313; *MacDonald* v. *Board of St. Commrs. of Boston,* 268 Mass. 288, 295–296 (no words indicative of a trust found); *Wakefield* v. *Attorney Gen.* 334 Mass. 632, 636 (gift stated to be "free and unrestricted").

From all the foregoing authorities, it is apparent that whether a gift, subject to a "condition" or stating a "purpose," imposes a trust or obligation is a matter of interpretation of the particular instrument and determination of the particular donors' intent. The intention of these grantors, and of the Legislature in authorizing acceptance of the deeds, "is to be ascertained from a study of the instrument[s] as a whole in the light of the circumstances attending . . . [their] execution. Search should be made for a general plan . . . designed to express a consistent and harmonious purpose." See *Jewett* v. *Brown,* 319 Mass. 243, 248. See also *Suburban Land Co. Inc.* v. *Billerica,* 314 Mass. 184, 189; *Knowlton* v. *Forbush,* 322 Mass. 703, 704; *Morris* v. *Smith,* 332 Mass. 34, 37–38; *Loring* v.

*Clapp,* 337 Mass. 53, 59; Powell, Real Property, § 317, p. 675; § 532.

Little help is gained from *Granara* v. *Commissioners of Walden Pond State Reservation,* 270 Mass. 458, an earlier case (1930) dealing briefly with these deeds. There the operator of a refreshment stand outside the reservation sought by mandamus to require the commissioners to prohibit the sale of light refreshments by the matron of the reservation. The commissioners (see p. 460), "finding that children and others . . . were exposed to danger from automobiles upon the State road while crossing to obtain . . . refreshments at . . . places . . . opposite the reservation, as a measure of safety [had] decided to allow . . . the matron . . . to furnish such articles . . . on the reservation." This was held not to be "use contra to the restrictions." This court did not consider whether (p. 461) "numerous, large and extensive places for the sale of refreshments within the reservation would contravene the purpose of the donors and constitute a breach of the condition," nor did it define that purpose. It plainly regarded the objections of the matron's competitor as of slight significance and as in no substantial sense an attempt to protect the public right. The court pointed out (p. 460) that the alleged violation had not resulted in any "complaint . . . by the donors . . . or by any one in their right."

The facts relating to the gifts and their background found by the auditor, however, are of great assistance in interpreting the deeds. He made the following findings, among others. "Walden Pond is an American literary shrine. Henry David Thoreau's . . . 'Walden,' and Ralph Waldo Emerson's prose and verse have made it well known . . . . [I]t has attracted a great number of tourists, nature lovers and others who have come to enjoy the fishing, swimming, bird watching and walking through its beautiful woodland." The pond, a great pond (G. L. c. 91, §§ 18A, 19, 19A, 35[6]), covers "about sixty-one acres . . .

---

[6] Section 18A was amended by St. 1931, c. 394, § 66. Section 19A was inserted by St. 1954, c. 258.

and [is] one and seven-tenths miles in circumference.'' It is ''encircled by hills which rise steeply from the water's edge.'' These are covered ''by a forest of pines, hickories, oaks, birches, alders, aspens, maples and other trees. . . . There are sandy beaches suitable for bathing . . . , the most accessible being at the easterly end.'' Since 1840, the railroad embankment has skirted the edge of the pond for about seventy-five yards. ''Highway Route 126 . . . runs along a ridge above the easterly end and is removed from the pond by several hundred yards at its closest point.''

Beginning in 1845, Thoreau ''lived . . . two years in a hut among the trees . . . on the northerly shore.'' In ''Walden,'' as quoted by the auditor, Thoreau described the pond as a place of singular beauty with ''few traces of man's hand to be seen.'' Then, ''there were no buildings'' except his hut and possibly another. Some lumbering and ice cutting took place in his time. In the last part of the last century the railroad made some commercial use of the westerly end of the pond for outings and picnics and of nearby land for amusement purposes. By 1910 the structures used for these purposes had disappeared. The early lumbering had no long term effect.

From 1910 to 1922, the public used the pond for fishing and for swimming, ''especially the accessible beaches at the easterly end . . . . Many persons came to walk through the woods and watch the birds. After the advent of the automobile . . . [their] number . . . greatly increased. Until 1922 the only parking area . . . was . . . at the easterly end . . . . From 1914 to 1922 the only buildings . . . were two small wooden bath houses, without roofs, and two small wooden [toilet] out-houses . . . and [for about two years] a small building . . . used for the sale of refreshments. . . . In all other respects, Walden had remained unchanged from 1910 to 1922 except for the changes wrought by nature in the vegetation and the terrain. No road existed . . . except an old, woodland road, overgrown with brush, which led to the site of Thoreau's hut. There

were only the old Indian foot path and a few woodland paths among the trees."

It became "increasingly difficult for . . . Lincoln and Concord to police the area." There were "problems of regulating . . . traffic and preventing forest fires . . . . [P]rior to June 2, 1922, . . . [the] owners offered to transfer their lands to the Commonwealth." Statute 1922, c. 499, was approved June 2, 1922, and (§ 6) took effect upon its acceptance by the commissioners on June 9, 1922. They on the same day accepted the deeds to the Emerson and Heywood grants, "subject . . . to the restrictions and conditions imposed under said deeds." "In 1922 Walden Pond was still a beautiful forest lake. . . . [T]here were no discernible breaks in the growth of trees and shrubbery. No roads led to . . . the shores at any . . . point."

The Emerson and Heywood grants were unique real estate in the history of Concord and of American letters. They have long formed an important part of the cluster of points of historic and literary interest by which visitors are attracted to Concord. At least one grantor was a member of the Emerson family. Ralph Waldo Emerson, as the auditor found, had owned the land on which Thoreau had built his hut. The reputation of the pond grows out of Thoreau's book (of which we take judicial notice). "Walden," describing his secluded life at the pond, is replete with references to the beauties of nature[7] and to wild life, trees, and plants. This background gives significance to the words, "it being the sole and exclusive purpose of this conveyance to aid the Commonwealth in preserving *the Walden of Emerson and Thoreau,* its *shores* and nearby *woodlands* for the public who wish to enjoy the [p]ond, the woods and nature, including bathing, boating, fishing and picnicking" (emphasis supplied). The "Walden of Emerson and Thoreau" was a "forest lake" in a simple rural area. Although its beauty and seclusion had been injured

---

[7] See e.g. Thoreau, Walden (New Riverside ed.) pp. 29–32, 66–68, 72–74, 131, 135–140, 177–182, 194–201, 246–249, 274–280, 289–298, 314–315, 420–428, 478–483, 487–489.

by the railroad and by some tree cutting, it remained in 1922 as closely in its natural state as a great pond less than twenty miles from the State House could well remain at the beginning of the automobile age. The "restriction and condition" of the deed against certain sports, amusements, and other activities were appropriate methods of preserving the pond as nearly as possible in its then state and of accomplishing the "sole and exclusive" purpose. That purpose we construe not only as part of the condition to which it is attached, but also as defining the terms of a public trust or obligation accepted pursuant to St. 1922, c. 499, by the commissioners charged by that statute with administering the reservation. A purpose defined as "sole and exclusive" was not merely precatory, but was what the donors said it was. The specific reference to Emerson and Thoreau can hardly have been intended only to point out a geographical area once connected with their names. That reference carries with it not only the association of these men with the pond area but also the significance which they gave to it and the condition and use of the pond area in their day. The use, doubtless displeasing to the donors, of the area for commercial purposes prior to 1910, which had been abandoned without substantial trace by 1922, and the problems of its growing use by the public in 1922, lend support to the view that the grantors' predominant purpose was to preserve the pond area in its natural aspect and character as associated with Emerson and Thoreau as far as was then practicable in a later period of time. By referring to the surroundings of Revere Beach, also, we think that the donors were indicating by contrast their intention that the pond area should remain free from artificial intrusions.

We hold that the predominant obligation imposed by the deeds was the preservation of the pond area as closely as practicable in its state of natural beauty. Nevertheless, we do not forget that the deeds authorized "bathing, boating, fishing, and picnicking." These words also must be given some significance and reconciled, so far as possible, with the

donors' dominant purpose. Although the principal con-
cern of the donors was the preservation of the Walden of
Emerson and Thoreau, they plainly did not intend Walden
Pond to be only an outdoor museum, merely to be looked at
by visitors. They expected it to be used for these sub-
sidiary purposes to an extent consistent with achieving
their major objectives. As we read the deeds, bathing,
boating, fishing, and picnicking may be encouraged, and
facilities for such uses, and for the comfort, safety, and con-
venience of bathers, fishermen, and other visitors, may be
provided and improved, so long as the physical aspect,
character, and appearance of the shores and woodland, as
seen from the pond and its shores, are not essentially
changed, and there is no interference with the dominant ob-
jective. This interpretation permits necessary mainte-
nance, policing, removal of fallen trees, planting of new.
trees, repair of erosion and damage by visitors, and care-
fully planned and placed, well concealed, inconspicuous con-
struction of essential structures. On the other hand, this
interpretation requires that structures, roads, vehicles, and
concessions shall not be placed on the shores and adjacent
woodland area in a manner and to an extent inconsistent
with the donors' primary purpose.

This interpretation of the deeds gives appropriate sig-
nificance to all of the words stating the conditions and
purposes of the conveyances and the obligations thereby
imposed. We find nothing inconsistent with this interpre-
tation in the statutes relating to the reservation. See foot-
notes 2 and 4, *supra*. Statute 1922, c. 499, authorized ac-
ceptance of the deeds on the donors' terms, thus in effect
making a contract with them (see *Milton* v. *Attorney Gen.*
314 Mass. 234, 235, 240) "which under the Federal Consti-
tution could not be impaired." The later statutes[8] have

---

[8] Although St. 1945, c. 123, § 2, directed the commission to "provide
reasonable access to and from . . . [the] pond for the owners of boats or
canoes . . . for use in fishing," this provision, when read with the commis-
sion's authority (§ 2) to regulate the use of outboard motors and sail and
motor boats, is consistent with the donors' purposes. Section 2 thus placed
in the hands of the commissioners the power to prevent mechanically operated
boats from disturbing the peace of the reservation and encouraged use of
canoes and boats "propelled by muscular power."

supplemented the 1922 act without prescribing in detail the methods to be followed in achieving the donors' objectives.

4. In the light of our interpretation of the deeds, we comment upon the following findings of the auditor about what the commissioners have done and propose to do:

(a) The auditor concluded that creation of a safe bathing beach would not have materially changed the appearance of the pond, if other methods of obtaining the necessary fill had been adopted. Cutting down the trees, however, and taking the material for such filling from the slopes above the pond, we think, violated the terms of the deeds since these acts caused "damage . . . to the sylvan beauty of" the pond.

(b) A roadway suitable for emergency use by "an ambulance or a light, service truck, could have been built," without as much destruction as the ramps already mentioned have caused. The ramps have not yet been covered with concrete, and apparently no such covering is now planned. Removal of the ramps or their "modification . . . into a footpath" would result in more effective "replanting and restoration of the denuded area." In view of these findings of the auditor, we hold that construction of the ramps in this manner was in violation of the deeds, and that the ramps must be removed or modified in a manner which will eliminate them as a substantial obstacle to reforestation and minimize the injury caused to the natural appearance of the area.

(c) The expansion of the parking area near Fishermen's Beach, so called, and building the gravel roadway for motor vehicles leading to the beach, were "necessary and desirable to accommodate fishermen . . . bringing their own boats. The road is built among the trees and is not objectionably conspicuous." On these findings of the auditor, the gravel road has not been shown to be in violation of the deeds, even though any road leading to the shores, if not carefully planned and concealed, is likely to change the area's character and appearance.

(d) "A new bath house with additional convenience sta-

tions," the auditor finds, "is reasonably necessary and desirable." He points out that the existing bath house for women is largely concealed by trees, but indicates that to "locate the new bath house on the beach would mar the beauty of the shore." On his findings, such construction on the beach, in the absence of appropriate arrangements for its effective concealment among trees, would be in violation of the deeds.

(e) The auditor considered that "expansion of the parking area off Walden Street was necessary . . . to accommodate the expected increase in attendance," but that it was without "careful study" of the present use of the reservation or "to determine the . . . number who can enjoy the pond and woodlands . . . without overcrowding and creating unsanitary conditions." To the extent that this parking space involved tree cutting, particularly of "part of the screen that made" the State highway "invisible from the pond," there was, we hold, violation of the deeds. Obviously, proper planning is necessary to avoid future overcrowding and pollution of the area inconsistent with the donors' dominant purpose. Reasonable efforts to conceal the parking area, by replanting of trees at its borders, must be undertaken, in order that there may be compliance with the terms of the deeds.

(f) The auditor states that the injury to "the natural beauty of the shore and woodland . . . cannot be immediately remedied," but that "it is possible, over a long period of time, to restore much of the sylvan charm of the denuded area by replanting . . . trees." He also points out the need of correcting the results of "erosion [of the ground cover] from rain, snow and pedestrians" and the proper methods of undertaking this corrective work. Performance of the obligations imposed by the deeds, we think, requires that, in orderly course, such replanting and erosion prevention be undertaken.

Although the auditor finds that the commissioners in what they did "acted in good faith," their contentions in these cases show that they misunderstood the 1922 deeds

and, accordingly, failed to give adequate attention to the donors' dominant purpose. It is not to be assumed that, as public officers, they "will not apply proper principles, now that those principles have been indicated." See *Board of Health of Woburn* v. *Sousa,* 338 Mass. 547, 554. Also, the extent to which it is feasible to take remedial action to remedy damage already done, and the manner in which such action and new work in the reservation should be undertaken, may involve some elements of official discretion and of county fiscal policy. Accordingly, the relief to be granted in the mandamus proceedings is general in terms.

5. As already stated, the equity proceeding is not to be maintained in the absence of intervention by the Attorney General or of his granting to the taxpayers authority to act in his name. The final decree dismissing the taxpayers' bill is to be affirmed, unless, within sixty days after receipt of the rescript in the Superior Court clerk's office, the Attorney General shall seek leave to intervene or shall grant such authority. If he takes either such course, the decree is to be reversed, and the case is to stand for further proceedings consistent with this opinion, which may include appropriate retention of jurisdiction to enforce the obligations of the deeds. See *Nassif* v. *Boston & Me. R.R.* 340 Mass. 557, 566. In the mandamus proceedings, judgment is to be entered commanding the commissioners to refrain from further violation of the provisions of the deeds of gift as interpreted in this opinion and to take action, in orderly course, within the limits of appropriations available from time to time, by replanting, landscaping, and erosion prevention work to reduce the damage already caused to the pond area and adjacent woodlands.

*So ordered.*