The **UNITED STATES** of America, Appellant,

v.

**QUINCY RAILROAD COMPANY,** Appellee.

No. 19257.

United States Court of Appeals Ninth Circuit.

Nov. 18, 1964.

---

6. The district court made no finding as to whether Sgt. Graves was a servant of the Club.

Cecil F. Poole, U. S. Atty., Robert N. Ensign, Asst. U. S. Atty., San Francisco, Cal., Sidney Brodie, Dept. of Justice, Henry L. Hilzinger, Richard C. Davis, Interstate Commerce Commission, Washington, D. C., for appellant.

Robert R. Harlan, Sacramento, Cal., for appellee.

Before ORR, HAMLEY and DUNIWAY, Circuit Judges.

HAMLEY, Circuit Judge.

Should Quincy Railroad Company, which employs three people and operates eight miles of track, pay a $250 civil penalty for a violation of the Locomotive Inspection Act alleged to have occurred on May 19, 1962? This is the question which the United States of America brings to us on appeal from a district court judgment for defendant, rendered after a full-blown trial including a pretrial order, the testimony of six witnesses, and proceedings on a motion for a new trial.

The steam locomotive which enjoys the spotlight in this litigation is Engine No. 8 of the Feather River Lumber Company. It is a venerable one, having been built by The Baldwin Locomotive Works in 1907. After forty-nine years of service, Engine No. 8 was retired by the lumber company on November 30, 1956. In the spring of 1958, the company gave the locomotive to the Plumas County Fair Association, a non-profit corporation, for historical display.

At that time the Fair Association did not have sufficient funds to move Engine No. 8 from Loyalton, California to the fairgrounds at Quincy. It therefore arranged with defendant, whose eight miles of track extend from Quincy to Quincy Junction, California, to have the locomotive deadheaded to Quincy and placed on defendant's siding at the Quincy depot. This was done on March 28, 1958. The last inspection report on Engine No. 8 was made on March 31 of that year.

At the instigation of the manager of the Fair Association, the "Feather River Shortline Railroad," a non-profit corporation, was then organized. It consists of a group of persons who are desirous of reliving memories of the steam railroad era and, in particular, of preserving Engine No. 8 and maintaining a place where it can be exhibited.

For the purpose of raising funds to accomplish these objectives, the Feather River Shortline Railroad sold "vice-presidencies" to anyone who was interested in preserving Engine No. 8. The fee for these "vice-presidencies" was ten dollars. Druggist S. L. Bailey of Quincy, who is the general manager of Shortline, testified that, for this fee, purchasers received " * * * a beautiful engraved certificate and also a good feeling that they had done their little part in preserving this locomotive."

However, there were apparently not enough "vice-presidencies" sold to finance the transportation of the locomotive to the fairgrounds. So Engine No. 8 remained on a siding at the Quincy depot through the snows of four winters. But its finest hour was yet to come.

On May 19, 1962, the Western Pacific Railroad Company, in coöperation with defendant, ran a railroad excursion from Oakland to Quincy. About two hundred railroad fans participated. At Quincy they took places on four gondola cars in which benches had been placed, provided by Western Pacific. These cars were on defendant's tracks and the cars were then hauled by defendant's Engine No. 2 from Quincy to Quincy Junction, and return.

Defendant received a fare of one dollar per passenger for running this train—fifty cents for children. Ray C. Smith, President of the Quincy Railroad Company, testified that his company's participation in the excursion was not motivated by profit, but just to coöperate with " * * * the rail fans, and people like that." He added: "You don't make any

money running a train out 6 miles and back for a dollar a head."

In anticipation of this excursion, the secretary of the Northern California Railroad Historical Society arranged with the Fair Association and the Shortline Railroad to place Engine No. 8 in operation on defendant's tracks on May 19, 1962 so that the excursionists could pridefully view and photograph it in action. In accordance with this plan, Engine No. 8, manned by a volunteer crew consisting of James Boynton, engineer, and William Dessert, fireman, was, on May 19, 1962, operated on its own steam over defendant's tracks from Quincy to Quincy Junction and return. Neither Boynton nor Dessert was an employee of defendant. Boynton was a locomotive engineer with the Western Pacific, but served on this occasion without compensation.

The locomotive was operated "light," that is to say, with a tender only, on the described run. No passengers were allowed on the locomotive or tender at any time. On the return trip from Quincy Junction, at a point known as Weldon's Field, a stop was made and No. 8 was coupled in front of No. 2. Both engines then hauled the train of gondola cars for a distance of from one hundred to three hundred feet so that the railroad enthusiasts could take moving pictures of the double heading.

Defendant consented to the operation of Engine No. 8 over its tracks on May 19, 1962, but received no compensation for the use of its tracks. Shortline received one dollar from each excursionist for operating Engine No. 8 in the manner described.

After the run, defendant built a little temporary track across the county road into the fairgrounds at Quincy, moved Engine No. 8 into the fairgrounds, and then took up the temporary track. There Engine No. 8 sits today on a piece of track, an exhibit to warm the hearts of all who have nostalgic memories of the days of the steam locomotive.

There was apparently one observer on that memorable May 19th, however, who had something else in mind. As a result the United States, on December 26, 1962, unmoved by the gallant performance of Engine No. 8, nor restrained by the spirit of the Christmas season, filed a complaint against the Quincy Railroad Company to collect a civil penalty in the sum of $250 for violation of section 2 of the Locomotive Inspection Act (Act), as amended, 43 Stat. 659 (1924), 45 U.S.C. § 23 (1958). Thus it becomes necessary to turn from the pleasant task of recounting the odyssey of Engine No. 8 and write in the language of the law.

The $250 civil penalty sought by the United States for such a violation, and the authority to bring suit to recover such a penalty, is provided for in section 3 of the Act, 71 Stat. 352 (1957), 45 U.S.C. § 34 (1958). Defendant admitted that it is a "carrier" within the meaning of section 1 of the Act, 45 U.S.C. § 22 (1958), but denied other essential allegations of the complaint. The case was tried to the court sitting without a jury. Findings of fact, conclusions of law, and a judgment favorable to defendant were entered. This appeal followed.

The Government contends that, under the facts reviewed above, the district court erred in concluding that defendant did not violate section 2 of the Act.

Section 2 provides, in part, that it shall be unlawful for any carrier to "use or permit to be used" on its line any locomotive unless it has been inspected from time to time in accordance with the provisions of the Act. Under the facts stated above, defendant did not "use" Engine No. 8 on its line on May 19, 1962, unless the incident which occurred at Weldon's Field, when No. 8 was coupled to defendant's No. 2, hauling the gondola cars, for a run of from one hundred to three hundred feet could be considered a use.

Without intending any disrespect to Engine No. 8, it was not coupled to defendant's train on that occasion be-

cause its horsepower was needed. As a matter of fact, if the truth were known, No. 8 probably received a gentle nudge or two from No. 2 on that shortest railroad train run to make the law books.[1] Nor was defendant making use of No. 8 for any other purpose. Instead of defendant making "use" of Engine No. 8 at Weldon's Field, the certified vice-presidents and people like that were making use of defendant's train, to the end that home movies could record the romance of No. 8 rolling in a double heading.

But while defendant did not use Engine No. 8 on the day in question, it did permit that locomotive to be used on its line. It therefore becomes necessary to determine what provisions of the Act defendant was required to comply with concerning a locomotive which it does not use, but which it permits another to use, on its line.

■ The Act contains no express provisions with respect to such duty. Sections 5 and 6, however, (45 U.S.C. §§ 28 and 29 [1958]), authorize the Interstate Commerce Commission to promulgate rules and regulations governing the inspection of locomotives and the time at which reports of such inspections shall be made to the inspector in charge. Rules adopted in the exercise of the authority so conferred acquire the force of law and become an integral part of the Act. See Lilly v. Grand Trunk Western Railroad Co., 317 U.S. 481, 486, 488, 63 S.Ct. 347, 87 L.Ed. 411.

Pursuant to the authority conferred by sections 5 and 6 of the Act, the Commission, on October 11, 1915, issued an order, thereafter supplemented and amended, prescribing rules and instructions for the inspection and testing of steam locomotives. 49 Code of Federal Regulations, part 91. Section 91.159 of these rules is cited in the complaint and relied upon by the Government as the rule which defendant violated on May 19, 1962. This rule reads:

"§ 91.159. *Report of inspection.* Not less than once each month and within 10 days after inspection a report of inspection, Form No. 1 (§ 91.51), size 6 by 9 inches, shall be filed with the United States inspector in charge for each locomotive used by a railroad company, and a copy shall be filed in the office of the chief mechanical officer having charge of the locomotive."

■ It will be observed that this rule pertains only to locomotives " * * * used by a railroad company. * * *" Under the undisputed facts set out above, Engine No. 8 was not used by a railroad company—either defendant or any other carrier—on the day in question. It was used only by a non-profit fair association and a non-profit association of railroad enthusiasts.

It follows that the district court correctly concluded that in permitting the Fair Association and Shortline Railroad to use its tracks for the run of Engine No. 8 on May 19, 1962, in the manner described and without a current inspection, defendant did not violate section 91.159 of the Commission Rules and therefore did not violate section 2 of the Act.

---

1. A fairly short railroad run was involved in a case which arose in Tennessee in 1897, when a Southern Railway Company train chased Mr. J. T. Phillips' mare along a railroad track until the animal reached an unfloored trestle. At this point the mare stopped, the train having already stopped some distance away. The fireman then left the engine and approached the mare, hoping to persuade her to leave the track. But the mare, apparently more frightened by the fireman than by the railroad train, ran over the trestle, injuring herself during the passage. See Southern Ry. Co. v. Phillips, 100 Tenn. 130, 42 S.W. 925. Fortunately, we are not here confronted with the perplexing question, presented in Phillips, of whether an earlier decision seemingly in point was to be disregarded because it involved a mule rather than a mare. Incidentally, the court held that the earlier case was at least persuasive, wisely noting that " * * * the mare and mule are bound quite closely by ties of consanguinity." We are indebted to Judge Walter L. Pope of this court for calling this case to our attention.

And so the saga of an ancient locomotive comes to an end on a happy note. Engine No. 8, whose uninspected boiler proved stout enough for this last run, may now remain on exhibit at the Plumas County Fairgrounds, unsullied by a judgment penalizing defendant for permitting this last fling. Indeed, the historical interest which old No. 8 has for those who remember when steam was the railroad way of life, may be augmented by the added luster of this court vindication.

Affirmed.