PENN CENTRAL COMPANY & another[1] *vs.* DEPARTMENT
OF PUBLIC UTILITIES.

Suffolk.    November 4, 1969. — December 4, 1969.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & REARDON, JJ.

*Public Utilities. Constitutional Law*, Interstate commerce, Railroad.
   *Jurisdiction*, Federal field, Railroad. *Interstate Commerce. Railroad*,
   Safety appliances. *Equity Jurisdiction*, Review of decision of Depart-
   ment of Public Utilities.

An order of the Department of Public Utilities requiring certain emergency
   lighting and tools to be provided in railroad passenger cars was not,
   as applied to self-propelled Budd cars, invalid as dealing with a field
   preëmpted by Federal statutes and regulations. [485]
Statement of determinations which, by reason of constitutional considera-
   tions, should be made by the Department of Public Utilities, and sup-
   ported by an adequate record, in connection with the adoption of
   regulations with respect to railroad passenger car safety. [486]
Where the record in a proceeding under G. L. c. 25, § 5, for review of an
   order of the Department of Public Utilities requiring certain emergency
   lighting and tools to be provided in railroad passenger cars did not
   reveal any substantial evidence of necessity therefor, a decree should
   be entered directing reconsideration of the matter by the Department
   and expansion of its record. [487]

PETITION filed in the Supreme Judicial Court for the
county of Suffolk on May 29, 1968.

The case was reserved and reported by *Cutter*, J., without
decision.

*Richard J. Ferriter* for Penn Central Company (*Chester A.
Prior* for Boston & Maine Corporation with him).

*Walter H. Mayo, III*, Assistant Attorney General, for the
Department of Public Utilities.

CUTTER, J.    The railroads seek review under G. L. c. 25,
§ 5, as amended, of an order (May 15, 1968) of the depart-
ment (the D.P.U.) requiring certain tools and emergency

---

[1] Boston and Maine Railroad.

lighting to be provided on railroad passenger cars operating in Massachusetts. In the county court the case was reserved and reported without decision by a single justice.

The D.P.U. in 1967, as a consequence of certain serious accidents involving self-propelled Budd cars on the Boston and Maine Railroad, ordered hearings concerning proposed safety regulations (see D.P.U. 15,418, 15,449, 15,577). Before the D.P.U. the railroads [2] filed motions to dismiss the proceedings for want of jurisdiction on the grounds that the proposed rules would be in violation of art. 1, § 8 (the Commerce Clause), of the Constitution of the United States and that, by virtue of 45 U. S. C. §§ 1–46 (1964), jurisdiction to prescribe regulations with respect to the matters covered in the proposed D.P.U. rules had been preëmpted and assigned to the Interstate Commerce Commission.[3] The D.P.U. denied the motions. Thereafter, the D.P.U. received evidence. On May 15, 1968, the D.P.U. issued an order (see D.P.U. 15,577) prescribing regulations, the pertinent portions of which are set out in the margin.[4]

1. The D.P.U. has broad power to prescribe safety regulations. G. L. c. 159, § 16. See also c. 160, § 163, as amended by St. 1967, c. 701. Cf. St. 1967, c. 853. The railroads contend, however, without attacking any Massachusetts

---

[2] The railroads represent that the New York Central Railroad Company and the New York, New Haven and Hartford Railroad Company became component parts of Penn Central Company after the commencement of these proceedings.

[3] By the Department of Transportation Act, Pub. L. 89–670, 49 U. S. C. §§ 1651 et seq. (Supp. III, 1965–1967), the duties of the Interstate Commerce Commission (see 80 Stat. 939) with respect to safety appliances on locomotives and cars were placed in the Secretary of the Department of Transportation. The railroads in their brief have not reproduced this or any other State or Federal statute. Under S. J. C. Rule 1:15 (1) (c) a brief must contain relevant statutory provisions.

[4] The order reads in part: "1. All railroad passenger cars operating in this Commonwealth shall be equipped with the following: a. An emergency battery operated light that will be illuminated automatically when regular lighting fails; and b. An ax, a fire extinguisher and a crowbar, stored at each end of the car, in a closet which shall be marked 'Emergency Equipment' with letters of luminous material at least three inches high and access to which shall not be obstructed by opening a door." The railroads do not pursue any appeal with respect to another portion of the D.P.U. order which relates to crossing gates.

statute, that D.P.U. 15,577, is not permissible, as a regulation in the field of railroad safety appliances, in the light of congressional enactments and regulations thereunder. They do not specify the particular Federal statutory sections with which they contend D.P.U. 15,577 is in conflict. In this court the railroads seem to rely generally upon the Boiler Inspection Act of 1911, 36 Stat. 913, now found in 45 U. S. C. §§ 22–34 (1964). Before the D.P.U. it was argued by one or more of the railroads that the field of railroad safety had been preëmpted by 45 U. S. C. §§ 1–46 (1964), containing Federal legislation on the subject of railroad safety equipment.

We thus must consider the extent to which the Federal statutes and regulations deal with the subjects covered in D.P.U. 15,577 (see fn. 4). First we discuss the Federal Boiler. Inspection Act.

Section 23 of Title 45 makes it unlawful for any rail carrier subject to the Interstate Commerce Act (see § 22) to use "on its line any locomotive unless . . . [the] locomotive, its boiler, tender, and all parts and appurtenances . . . are in proper condition and safe" and unless the locomotive, its boiler, tender, and parts have been inspected as provided in §§ 28 to 30 and 32 and are able to withstand such tests as may be prescribed in rules and regulations. Section 28 provides that each carrier shall file rules for the inspection of locomotive boilers which shall become obligatory upon approval by the Interstate Commerce Commission (I.C.C.), subject to the proviso that, if the carrier does not file its rules, the I.C.C.'s director of locomotive inspection may prescribe obligatory rules subject to the I.C.C.'s approval. See *United States* v. *Baltimore & Ohio R.R.* 293 U. S. 454, 459–462. Section 29 provides for inspections by I.C.C. inspectors. Section 30 provides that the director of locomotive inspection and two assistants shall have "the same powers and duties with respect to all the parts and appurtenances of the locomotive and tender that they have with respect to the [locomotive] boiler" and that the provisions of §§ 22 to 29 and 31 to 34 shall "apply to . . . the entire locomotive

and tender and all their parts" as fully as to locomotive boilers.

The Federal railroad administrator on December 18, 1968, issued a new compilation of the regulations of the Department of Transportation which are under the jurisdiction of the Federal Railroad Administration. See 33 Fed. Reg. 19607. Certain of these are set out in the margin.[5] Part 230 of these regulations is entitled "Locomotive Inspection." It is stated (33 Fed. Reg. 19622) that the basic statutory authority for the part is 45 U. S. C. §§ 23, 28 (portions of the Federal Boiler Inspection Act). There obviously is doubt whether any of these regulations cover the same ground with which D.P.U. 15,577 purports to deal, and whether the definition of "locomotive" in § 230.0 was designed to deal with Budd cars at all.

Part 231 of the same regulations (33 Fed. Reg. 19663) is entitled, "Railroad Safety Appliance Standards." It recites as its statutory basis, 45 U. S. C. §§ 2, 4, 6, 8, 10, 11–16. (1964). These are portions of the statute (see also 49 U. S. C. § 26 [1964]) sometimes referred to as the Safety Appliance Acts. See 45 U. S. C. § 16 (1964). In general these pro-

---

[5] 49 C. F. R. § 230.0 (33 Fed. Reg. 19622) defines a locomotive as follows: "A locomotive is a self-propelled unit of equipment *designed for moving other equipment* and includes a *self-propelled unit designed to carry . . . passenger* traffic" (emphasis supplied). Subpart A (§§ 230.1–230.55) of part 230 deals with boilers and appurtenances. Subpart B deals with steam locomotives and tenders. Subpart C is entitled, "Other Than Steam Locomotives and Appurtenances." The only provision of subpart C which seems to have possible relevance to the D.P.U.'s regulations is § 230.233 (33 Fed. Reg. 19647) relating to "cab lights." Paragraph (b) reads, "[c]ab passageways and compartments shall have adequate illumination. When employees are required to pass from one cab to another, the platform or passageway between them shall be illuminated." Paragraph (d) reads, "All lights may be entirely supplied from storage batteries if desired. Where lights are not supplied from storage batteries, there shall be two or more lighting circuits for providing illumination required by paragraphs (a), (b) and (c) of this section. Battery containers shall be properly vented." Section 230.200 (33 Fed. Reg. 19636) provides that subpart C "contains rules . . . for the inspection and testing of locomotives propelled by other than steam power except electrically operated units designed to carry . . . passenger traffic operated by a single set of controls. For multiple operated electrical units see Subpart D of this part," which applies (see § 230.400; 33 Fed. Reg. 19654) to certain electrically operated units. It is not clear on this record whether the description includes Budd cars. As to units included in subpart D, § 230.456 (33 Fed. Reg. 19662) provides somewhat ambiguously that each "unit shall be equipped with the same complement of safety appliances as is required for passenger-train cars included in the classification comparable to it set up in Part 231."

visions relate to specific safety devices.[6] In any event, the regulations contained in part 231, so far as applicable to passenger train cars (§§ 231.12–231.14), do not seem to deal in specific terms with emergency lights and emergency tools.

The railroads put principal reliance on *Napier* v. *Atlantic Coast Line R.R.* 272 U. S. 605. In that case, under the Boiler Inspection Act (as amended through 1924, see 43 Stat. 659), State statutes requiring certain features to be included in locomotives were held invalid, because Congress by the act, as amended, had shown an intention (pp. 611–613) "to occupy the . . . field" of "the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances." State legislation in the field was held to be precluded, even though there had been no effort by the I.C.C. under its regulatory power to deal with the precise aspects of locomotives regulated by the State statutes. The Safety Appliance Act (now 45 U. S. C. §§ 1–16) was distinguished because "its requirements are specific." See *Atlantic Coast Line R.R.* v. *Georgia*, 234 U. S. 280, 293, where State regulation of headlights was held permissible, because (p. 294) "Congress . . . [had] not yet decided to establish regulations, either directly or through its subordinate body, as to the appliance" there discussed. Cf. *Southern Ry.* v. *Railroad Commn. of Ind.* 236 U. S. 439, 446–447, and *Gilvary* v. *Cuyahoga Valley Ry.* 292 U. S. 57, 60–61, which may state too broadly the rule concerning precluding State regulation. The *Napier* case was followed in *United States* v. *Baltimore & Ohio R.R.* 293 U. S. 454, 458–459. It was somewhat limited in its application to an extra experimental device in *Southern Ry.* v. *Lunsford*, 297 U. S. 398, 402.

---

[6] Examples of these provisions include: § 1 (train brake systems), § 2 (automatic couplers), § 4 (grab irons for use by crews while connecting cars), § 5 (standard height of draw bars for freight cars), § 9 (number of cars in train to have power brakes), and § 11 (ladders, running boards, handholds). Section 8 makes the specific requirements of §§ 1–7 applicable to all cars used by railroads engaged in interstate commerce. Section 11 makes unlawful use of any car subject to §§ 11–16 not equipped with appliances required by this section. Section 12 gives the I.C.C. power to prescribe the number, dimensions, location, and manner of application of the appliances mentioned in §§ 4 and 11.

Later cases may have blunted the force of the *Napier* case in some areas. For example, in *Terminal R.R. Assn. of St. Louis* v. *Brotherhood of R.R. Trainmen,* 318 U. S. 1, 4–9, the Supreme Court said that an Illinois commission could order caboose cars for certain trains and services (p. 7) "in the absence of any Act of Congress that conflicts with the order or may be said to occupy its field," although (pp. 8–9) the order might "in some measure . . . retard and increase the cost of movements in interstate commerce."[7] See *Huron Portland Cement Co.* v. *Detroit,* 362 U. S. 440, 443–448, holding that the Detroit smoke abatement code applies to ships, generally engaged in interstate commerce, but the opinion (p. 443) cites the *Napier* case in saying, "Evenhanded local regulation to effectuate a legitimate local public interest is valid unless preempted by federal action . . . or unduly burdensome on . . . interstate commerce." Cf. *Southern Pac. Co.* v. *Arizona,* 325 U. S. 761, 766–784, but see p. 766 ("Congress, in enacting legislation . . . [regulating] interstate commerce, will not be deemed to have intended to strike down a state statute designed to protect the . . . [public] safety . . . unless its purpose to do so is clearly manifested . . . or unless the state law, in terms or in its practical administration, conflicts with the Act of Congress, or plainly . . . infringes its policy").

In a careful recent decision the Supreme Court of New Jersey upheld an order of that State's board of public utility commissioners requiring partial restoration of manual flagging in territory protected by manual block signals, in part on the ground that the Interstate Commerce Act (49 U. S. C. § 26 [1964]) did not preclude such State action. *Re Complaint of Brotherhood R.R. Trainmen,* 49 N. J. 174. It was stated (p. 182) by Jacobs, J. that the *Napier* case, 272 U. S.

---

[7] Cases in related fields of interstate commerce also may show in some degree a departure from the views of the *Napier* case. See *California* v. *Zook,* 336 U. S. 725, 733–738, but see p. 737, fn. 13; *Florida Lime & Avocado Growers, Inc.* v. *Paul, Director of the Dept. of Agriculture of Cal.* 373 U. S. 132, 141–142; *Brotherhood of Locomotive Engrs.* v. *Chicago, R. I. & Pac. R.R.* 382 U. S. 423, 429–437 (no congressional preëmption prevented application of Arkansas "full-crew" law).

605, 611, "has never been applied as broadly as the [r]ailroads contend . . . [I]n any event it dealt, not with a supplemental local emergency safety device . . . but with equipment attached to the locomotive which passes . . . from state to state and with respect to which the national interest in uniformity is vital and paramount." This language, of course, recognized that the *Napier* case may still be followed with respect to locomotive equipment where the boiler inspection legislation clearly is applicable, despite (pp. 182–183) the tendency of the later Federal decisions, already cited, to treat State regulation, with local safety as its objective, as not precluded by congressional preemption, See notes, 73 Dickinson L. Rev. 126, 131–134, 140–141. 146–148; 1969 Utah L. Rev. 169, 174–181. Cf. *Bessemer & Lake Erie R.R.* v. *Public Util. Commn.* 430 Pa. 339, 346–348.

Despite the failure of recent cases directly to apply the *Napier* case, we assume, without deciding, (1) that the case will still prevent enforcement of State requirements of specific appliances (of the type generally prescribed by a Federal agency pursuant to the Boiler Inspection Act) on railroad vehicles clearly to be classed as locomotives, and (2) that some peripheral State safety regulation in the area for the protection of the public may escape the ban of the *Napier* case. Applying these assumptions, we conclude that the D.P.U. order concerning emergency lighting and hand tools deals with matters not directly affecting the basic construction of a Budd car.

We think that the order does not attempt to control matters of the type dealt with by the Boiler Inspection Act and the regulations under it. The Federal regulations themselves (fn. 5) have no very plain reference to such lights and tools. Section 230.233, which seems the regulation most likely to be at all pertinent, relates to locomotive cabs and cab passageways, rather than to passenger cars or compartments to which D.P.U. 15,577, par. 1a, has reference. Paragraph 1b of D.P.U. 15,577 relates to emergency tools which seem not to be covered at all under any of the Federal regulations. Certainly par. 1b does not deal with

the same subject as any specific requirement of the Safety Appliance Act or the regulations under it. We think that this type of State requirement is not precluded by any Federal preëmption, even if a Budd car may be classed as a locomotive because possibly within the language of § 230.0 and because designed and used for hauling passengers. See *Baltimore & Ohio Ry.* v. *Jackson*, 353 U. S. 325, 328–331, fn. 4. Cf. *Mazzucola* v. *Pennsylvania R.R.* 281 F. 2d 267, 268–269 (3d Cir.); *United States* v. *Fort Worth & Denver City Ry.* 21 F. Supp. 916, 917–919 (N. D. Tex.). Cf. also *United States* v. *Quincy .R.R.* 338 F. 2d 430, 432–434 (9th Cir.).

2. The railroads also argue that, even if D.P.U. 15,577 does not attempt to control matters preëmpted by Congress, it still places a substantial burden on interstate commerce in an area where uniform regulation is necessary. They point to the circumstance that each railroad operates in two or more States and uses the equipment of other railroads on an interchange basis. They suggest various respects in which an unreasonable burden may be imposed upon interstate railroad activity by the regulations. See *Southern Pac. Co.* v. *Arizona*, 325 U. S. 761, 766, 770–784. See also *Huron Portland Cement Co.* v. *Detroit*, 362 U. S. 440, 448.

What has already been said amply indicates that the regulations set out in D.P.U. 15,577 lie in a doubtful and sensitive area, where unfortunate conflicts between State and Federal interests may arise. An administrative body operating in this area will do well (even in a regulatory proceeding under G. L. c. 30A, §§ 2, 3, which is not subject to those provisions of c. 30A governing adjudicatory proceedings) to develop a record containing substantial evidence, and preferably definite D.P.U. findings supported by that evidence, which establishes the validity of the regulations under applicable constitutional or statutory [8] provisions. Compare

---

[8] The statutory standards are found in G. L. c. 159, § 16, and on c. 160, § 163, as amended. These sections imply D.P.U. consideration of all relevant aspects of the public interest, with special reference under c. 160, § 163, to questions of public safety. Chapter 159, § 16, requires also appropriate attention to the railroads' financial ability to comply.

the standards considered in *Pioneer Liquor Mart, Inc.* v. *Alcoholic Bev. Control Commn.* 350 Mass. 1, 7–8. This is of special importance in a proceeding where review of the regulations on Federal issues may be sought.

Applicable constitutional considerations in this area call at least for D.P.U. determinations (a) that the regulations do not improperly invade an area preëmpted by Federal legislation and regulation; (b) that they are not inconsistent with applicable Federal regulations; (c) that they do not impose an unreasonable burden on interstate commerce, particularly in matters where interstate uniformity is important; and (d) that, pursuant to the pertinent statutory authority, there is basis for concluding that the regulations are reasonably necessary or appropriate in the public interest. Little in the record provides any basis for determining whether there has been D.P.U. consideration of these matters.

The motions to dismiss were properly denied at any early stage of the D.P.U. proceedings, because (as has been indicated above) some D.P.U. regulatory action might be permissible notwithstanding the Federal statutes and regulations. Thereafter the transcript shows slight, if any, D.P.U. consideration of possible conflict with Federal requirements.

The evidence showing any necessity whatsoever for the two proposed rules is fragmentary, speculative, and unconvincing. The D.P.U.'s own expert witness testified that existing lighting equipment on Budd cars gave essentially the protection called for by par. 1a of D.P.U. 15,577, although there had been no prior rule requiring the existing equipment. The witness had little information bearing upon whether the present emergency tool protection was adequate, although he gave some indication (a) that in Budd cars access to the cabinet containing the tools might be blocked if the rear door of the car was open, and (b) that it might be advantageous to have a luminous label on the emergency cabinet. Even after a series of prodding, leading questions by the chairman, the witness gave at most reluctant and lukewarm indorsement of the proposed rules.

He knew of no accident where lack of emergency tools had been a factor. Other testimony gave no greater support to either rule.

Determinations concerning the necessity for railroad regulations in the public interest, of course, are to be made by the D.P.U. and not by this court. Nevertheless, the D.P.U. must act within its statutory authority, without invasion of Federal exclusive jurisdiction, and upon some substantial showing that its proposed regulations are reasonable and appropriate.

With respect to regulations of the type under discussion, the record should show also that the D.P.U. has considered whether the proposed rules are unreasonable or improper in the light of existing Federal requirements or impose an undue burden on interstate commerce. We recognize that this opinion is the first recent occasion this court has had to discuss regulations of the type before us. For this reason and because evidence of any necessity for the rules is insubstantial, we conclude that the D.P.U. should reconsider the rules in the light of this opinion.

3. The case is remanded to the county court for further proceedings consistent with this opinion and the entry of a decree directing reconsideration and expansion of the record before the D.P.U.

*So ordered.*

