W. Broadway Task Force, Inc. *v.* Commr. of Dept. of Comm. Affairs.

erally, and of the specific three year provisions of G. L. c. 73, § 4B. It is not for this court to rule on the wisdom of tenure policy for State educational institutions. It may, however, be appropriate to point out that the effect of our construction of St. 1965, c. 572, § 44, is simply to leave the development of tenure policies within the power of the Board of Trustees of State Colleges, and that this increased autonomy seems entirely consistent with other sections of St. 1965, c. 572, which reorganized the existing government of State colleges.

The final decree is reversed. A new final decree is to be entered making a binding declaration that St. 1965, c. 572, § 44, not G. L. c. 73, § 4B, controls with respect to the plaintiff, and that he was not a faculty member on tenure and does not have rights as such.

*So ordered.*

---

WEST BROADWAY TASK FORCE, INC. & others *vs.*
COMMISSIONER OF THE DEPARTMENT OF COMMUNITY
AFFAIRS & others.

Suffolk.    April 3, 1973. — June 20, 1973.

Present: TAURO, C.J., REARDON, QUIRICO, HENNESSEY, & KAPLAN, JJ.

*Housing. Equity Jurisdiction,* Housing. *Landlord and Tenant,* Repairs.

It was not error to sustain demurrers to a bill for declaratory relief seeking a continuing injunction to compel the Boston Housing Authority and the Department of Community Affairs to maintain in sound condition a state-aided, low-rent Boston housing development where alternative remedies appeared to exist and had not been shown to be ineffective. [749, 752–755]

Discussion of occasions for judicial intervention in public housing agency action upon a suit by affected tenants. [750–752]

Discussion of procedures to attain satisfactory living conditions of state-aided, low-rent housing developments without resorting to continuing judicial supervison of public housing agency management. [752–754]

BILL IN EQUITY filed in the Superior Court on May 19, 1970.

The suit was heard by *Ponte,* J., on demurrers.

*Robert Burdick* for the plaintiffs.

*Brian P. Shillue* for Boston Housing Authority.

*Terence P. O'Malley*, Assistant Attorney General, for the Commissioner of the Department of Community Affairs & another.

KAPLAN, J.   This suit demanded a declaration and injunction with respect to alleged substandard physical conditions at a State-aided, low-rent housing development in the city of Boston.   The Superior Court entered interlocutory decrees sustaining demurrers to the bill of complaint without leave to amend, and thereafter entered a final decree dismissing the bill.   The plaintiffs appeal from these decrees.

One corporate and eight individual plaintiffs filed the bill on May 19, 1970.   The plaintiff West Broadway Task Force, Inc. is a nonprofit corporation composed of certain tenants living in, and elected to represent the residents of, the West Broadway Housing Development (development), one of the housing projects of the Boston Housing Authority (BHA).   The eight individual plaintiffs are tenants in that development.   It was alleged that the plaintiffs sued on their own behalf and on behalf of all low income persons "who now are or will become tenants in the Development" and whose common or separate premises "are not or will not be decent, safe and sanitary."   Named as defendants were BHA and the State Department of Community Affairs (DCA), together with the Commissioner of DCA.

The object of the suit was to have the Superior Court declare and enforce by continuing injunction an obligation on the part of the defendants to maintain the development in sound condition.   This duty, the bill averred, had remained unfulfilled over a period of time. A hundred inspections by the Boston housing inspection department had turned up over 300 violations (not particularly specified) of the State Sanitary Code,[1] and

---

[1] The reference was to minimum standards of fitness for human habitation, Regs. 1–18 of Article II of the State Sanitary Code, adopted by the Department of Public Health under G. L. c. 111, § 127A.

363 Mass. 745                                        747

W. Broadway Task Force, Inc. *v.* Commr. of Dept. of Comm. Affairs.

conditions in most apartments and common areas were below the Code standards. Although the defendants knew or should have known of the existence of such conditions, they had failed to eliminate them. The class represented by the plaintiffs had suffered and would in future suffer irreparable harm to their health, safety, morals, welfare, and comfort by reason of this neglect. Alleging in general terms that they had no adequate remedy at law and had exhausted all available administrative remedies, the plaintiffs prayed for a declaration that BHA had a legal duty to maintain the development in decent, safe, and sanitary condition at all times, and that DCA and its Commissioner had a duty to ensure that that condition was maintained; further, the plaintiffs prayed that an injunction issue enjoining the defendants from failing to carry out these duties forthwith and in the future.

The bill relied mainly on G. L. c. 121B,[2] the statute setting forth the purposes, powers, and responsibilities of BHA and of DCA and the nature of the relationship between the two agencies, and the bill is to be read in the light of that statute as well as of the practicalities mir-

_____

[2] Also referred to was a "Contract for Financial Assistance" dated December 4, 1956, between the Commonwealth (through DCA's predecessor) and BHA which states in an insurance-oriented clause that BHA "at all times shall maintain the project in good repair, order, and condition to assure its successful operation throughout its expected life," and in case of damage to or destruction of the project, shall repair or restore the project to the greatest practicable extent with the proceeds of all insurance claims and other moneys available for the purpose.

In addition the bill referred to the DCA-sponsored model lease between local housing authorities and tenants by which the landlord agreed to provide at the commencement of the term an apartment complying with the Sanitary Code; to maintain the common areas in proper condition; and upon notice to make necessary repairs, with provision for tenant's appeal to a hearing panel if the authority claimed that the repairs were not necessary.

Under DCA "Regulations Prescribing Lease Provisions for Public Housing," effective February 22, 1973, setting forth future guidelines for local housing authorities, the model lease obligates the landlord to maintain the apartment and common areas in decent, safe, cleanable, and sanitary condition, in compliance with the Sanitary Code and other State or local codes. As to repairs under this model lease, see n. 22, *infra*. (The parties in the present case agreed that the court might refer to the recent DCA regulations mentioned here and in notes 5, 17, and 18, *infra*.)

748                                    363 Mass. 745

W. Broadway Task Force, Inc. *v.* Commr. of Dept. of Comm. Affairs.

rored in it. BHA is established as a local housing authority with operating responsibility and corresponding powers regarding the finances, construction, maintenance, and day-to-day management of housing projects in the city of Boston.[3] DCA is the administrative superior with power to oversee most phases of the operations of the local housing authorities, and to that end it is given various powers of approval and veto of the activities of those authorities together with rule making power and power to demand reports and other information.[4] The statute sets before BHA, as operator, and DCA, as supervisor, the goal of providing decent, low cost housing. This note is struck in G. L. c. 121B, § 32, inserted by St. 1969, c. 751, § 1, and as amended through St. 1971, c. 1114, § 1, where the Legislature says: "It is hereby declared to be the policy of this commonwealth that each housing authority shall manage and operate decent, safe and sanitary dwelling accommodations" but this is to be done "at the lowest possible cost" with no thought of profit. Section 32 goes on to provide a specific formula for fixing rents designed to put the housing within the reach of low income tenants, as defined.[5] Expenses including carrying charges on borrowed money presumably cannot be met by the rents and so the budget of a local housing authority — which requires approval of DCA — must be supplemented by annual contributions from the Commonwealth through DCA. Physical maintenance competes with other necessities in the budget which must be framed in the light of what the Commonwealth can be expected in fact to appropriate. The level of repair, rehabilitation, and so forth, and the pace at which these measures can be carried out, are thus shaped by a number of management choices involving experience and judgment.

---

[3] See G. L. c. 121B, §§ 1, 3, 7, 11–16, 26–37.

[4] See G. L. c. 121B, §§ 1, 11, 29, 30–32, 34, 35, 37; c. 23B, §§ 1, 3.

[5] See also DCA's "Regulations for the Determination of Rents in State-Aided Low Rent Housing," effective February 22, 1973.

363 Mass. 745                                      749

W. Broadway Task Force, Inc. *v.* Commr. of Dept. of Comm. Affairs.

When read in relation to the statute, the bill in effect asks the court to find and declare that the defendant agencies failed to do all that they could to carry out a general statutory policy or aim, and, further, to order the agencies so to exercise their operational and supervisory powers as to do more in the future to fulfill the policy. In argument counsel disclaimed the idea that under the injunction prayed for sanctions could be imposed for discrete defects in the housing, but in his view sanctions could be imposed for general deficiencies; this superintendence by the court was apparently to be exercised without any definite limit of time. Whether the law envisages such a relationship between these agencies and the court is the main question posed by the appeal. We conclude that it does not, unless, perhaps, more normal remedies have been attempted and shown to be unavailing to improve conditions as far as they are reasonably capable of being improved within the limiting factors already mentioned.

Tenants might have difficulty securing judicial review of a policy of a local housing authority while there was still a fair prospect that DCA would attempt to correct that policy by administrative methods and ultimately by suit under § 29 [6] or § 34 (c).[7] See *Sullivan* v. *Fall River Housing Authy.* 348 Mass. 738 (involving a proposed rent increase).[8] In the present case, however, as both

[6] Present § 29 inserted by St. 1969, c. 751, § 1, and as amended by St. 1970, c. 851, § 3 (last paragraph) reads: "Except as otherwise stated therein, compliance with this chapter, the rules and regulations adopted by the department and the terms of any low-rent housing project or clearance project authorized by this chapter, may be enforced by a proceeding in equity." The earlier parallel provision was G. L. c. 121, § 26U (last sentence), repealed by St. 1969, c. 751, § 2.

[7] Present § 34 (c) as appearing in St. 1970, c. 359, § 2, reads in part: "The department may enforce any of its orders, rules or regulations or the provisions of any contract between the commonwealth and a housing authority by a bill in equity filed in the superior court or by a petition for a writ of mandamus filed under the provisions of section five of chapter two hundred and forty-nine." The earlier parallel provision, G. L. c. 121, § 26NN (c), was repealed by St. 1969, c. 751, § 2.

[8] There was a suggestion in the *Sullivan* case that in the particular situation the tenant might bring mandamus against the supervisory

BHA and DCA are alleged to be delinquent, we may assume that affected tenants are not technically barred from applying to a court of equity for relief. Nor would such an avenue be closed to tenants by the fact that the statute does not expressly grant them a right to seek judicial review of the agencies' behavior.[9] See *Stockus* v. *Boston Housing Authy.* 304 Mass. 507, 512; *Worcester Knitting Realty Co.* v. *Worcester Housing Authy.* 335 Mass. 19, 21–22, 24. Cf. *Leedom* v. *Kyne*, 358 U. S. 184, 189–190; *Abbott Labs.* v. *Gardner*, 387 U. S. 136, 139–141; *Environmental Defense Fund, Inc.* v. *Hardin*, 428 F. 2d 1093, 1098 (D. C. Cir.) ; *Hahn* v. *Gottlieb*, 430 F. 2d 1243, 1249 (1st Cir.) ; Jaffe, Judicial Control of Administrative Action, 336–376.

The question of the proper occasions for judicial intervention upon the suit of affected tenants would remain. A challenge to agency action as being unconstitutional,[10] or offensive to a specific statutory command or prohibition,[11] would be such an occasion. A charge of arbitrary or capricious action by the agency, like a charge that the agency was exceeding its "jurisdiction," could also pre-

agency if it failed to enforce the statute against the local housing authority. 348 Mass. at 739.

As to tenant attacks on proposed rent increases in certain Federally assisted housing projects, see *Hahn* v. *Gottlieb*, 430 F. 2d 1243 (1st Cir.), *McKinney* v. *Washington*, 442 F. 2d 726 (D. C. Cir.), and *Langevin* v. *Chenango Court, Inc.* 447 F. 2d 296 (2d Cir.). See also *Burr* v. *New Rochelle Municipal Housing Authy.* 347 F. Supp. 1202 (S. D. N. Y.). Compare the discussion in Note, 86 Harv. L. Rev. 880, 894–902.

[9] The Administrative Procedure Act, G. L. c. 30A, has no application to the present case because the agencies' action involves neither adjudication nor rule making. Mandamus seems inapplicable because the action involves discretion. (Compare n. 8, *supra*, where the statute laid down a formula for determining rentals.)

[10] See *Nason* v. *Commissioner of Mental Health*, 351 Mass. 94, 98 (for a subsequent episode in the case, see *Nason* v. *Superintendent of Bridgewater State Hosp.* 353 Mass. 604); *Escalera* v. *New York City Housing Authy.* 425 F. 2d 853, 856, 865 (2d Cir.) ; *McQueen* v. *Druker*, 438 F. 2d 781, 782, 784 (1st Cir.).

[11] See *James Constr. Co. Inc.* v. *Commissioner of Pub. Health*, 336 Mass. 143, 146–147; *Nickols* v. *Commissioners of Middlesex County*, 341 Mass. 13, 22–25; *Turnpike Amusement Park, Inc.* v. *Licensing Comm. of Cambridge*, 343 Mass. 435, 437–438; *North City Area-Wide Council, Inc.* v. *Romney*, 428 F. 2d 754, 757 (3rd Cir.).

363 Mass. 745                                           751

W. Broadway Task Force, Inc. *v.* Commr. of Dept. of Comm. Affairs.

sent a plausible situation for appeal to an equity court.[12] Even in a field in which the agency is acknowledged to have latitudinous discretion, a court would not be excluded if the agency appeared to have been actuated by clearly inapposite or unreasonable considerations.[13] And it may be granted that for purposes of the availability of judicial review, inaction by an agency over a period of time could count as the equivalent of a final refusal to act.[14]

The instant bill does not allege facts which would bring this case into any of the categories described. Nearest is the set of cases holding even discretionary behavior accountable to the canons of reason, but the bill here does not assert that BHA or DCA is pursuing specific policies or being moved by specific considerations that are beyond rational justification. The case as alleged rather resembles those more commonplace situations in which courts have regularly resisted the temptation to substitute their initiative or judgment for that of agencies charged, as the defendant agencies are here charged, with primary responsibility for discretionary choices. See *Stockus* v. *Boston Housing Authy.* 304 Mass. 507, 509–511; *McAuliffe & Burke Co.* v. *Boston Housing Authy.* 334 Mass. 28, 31–32; *School Comm. of Springfield* v. *Board of Educ.* 362 Mass. 417, 447. The reluctance is deepened by the traditional and still understandable distaste expressed by the court for undertaking the continuing superintendence of the management or repair

[12] See *Stockus* v. *Boston Housing Authy.* 304 Mass. 507, 511–512; *McAuliffe & Burke Co.* v. *Boston Housing Authy.* 334 Mass. 28, 30–32; *Worcester Knitting Realty Co.* v. *Worcester Housing Authy.* 335 Mass. 19, 22.

[13] See *Penn Cent. Co.* v. *Department of Pub. Util.* 356 Mass. 478, 485–486; *School Comm. of Chicopee* v. *Massachusetts Commn. Against Discrimination*, 361 Mass. 352, 354–355; *Cappadora* v. *Celebrezze*, 356 F. 2d 1, 5–7 (2d Cir.); *Medical Comm. for Human Rights* v. *Securities & Exch. Commn.* 432 F. 2d 659, 674–676 (D. C. Cir.), app. dism. as moot sub nom. *Securities & Exch. Commn.* v. *Medical Comm. for Human Rights*, 404 U. S. 403.

[14] See *Environmental Defense Fund, Inc.* v. *Hardin*, 428 F. 2d 1093, 1098–1100 (D. C. Cir.).

or rehabilitation of properties. See *Channel Fish Co. Inc.* v. *Boston Fish Mkt. Corp.* 359 Mass. 185, 187.

Courts, however, have been keen to override traditional limitations and scrutinize agency action when health or life was at stake, see *Wellford* v. *Ruckelshaus*, 439 F. 2d 598, 602–603 (D. C. Cir.), and the present bill unmistakably and properly announces this theme. So we might be impelled to require the Superior Court to accept the bill, with the burden of supervising agency management as implicitly demanded by the prayers of the bill, if we were not persuaded that more effective, albeit less heroic, procedures are available for striving to achieve satisfactory conditions at this and other housing developments.[15] (For the significance of the existence of such alternatives, see Saferstein, Nonreviewability: A Functional Analysis of "Committed to Agency Discretion," 82 Harv. L. Rev. 367, 393–395.[16]) First, while this appeal was pending, DCA issued "Regulations for Tenant Participation in the Administration of Public Housing in Massachusetts"[17] presenting guidelines to be followed by local housing authorities in setting up permanent arrangements for consultation between themselves and tenant organizations with respect to administrative and management problems. Apparently these subjects would include policies of physical maintenance as well as questions arising on proposed annual operating budgets. In case of disagreement, discussions may be had with DCA. Whether or not these regulations will tend actually to democratize the running of the housing projects, they carry a promise of bringing the officials

[15] The plaintiffs' allegation in their bill that they had no adequate remedy at law and had exhausted administrative remedies failed to furnish particulars.

[16] See the listing and weighing of considerations tending for and against judicial review in the cited article and in *Cappadora* v. *Celebreeze*, 356 F. 2d 1, 4–7 (2d Cir.); *Hahn* v. *Gottleib*, 430 F. 2d 1243, 1249–1251 (1st Cir.); *Langevin* v. *Chenango Court, Inc.* 447 F. 2d 296, 302–304 (2d Cir.).

[17] The regulations, effective February 22, 1973, implement G. L. c. 121B, § 32 (last paragraph) requiring that "[a] housing authority or its designee shall meet at reasonable times with tenant organizations to confer about complaints and grievances . . .."

363 Mass. 745    753

W. Broadway Task Force, Inc. *v.* Commr. of Dept. of Comm. Affairs.

to a closer understanding of the needs of tenants.  DCA
has also issued "Regulations Relating to Tenant Griev-
ance Procedures"[18] which will regularize access of indi-
vidual tenants to a grievance machinery that includes a
form of "appeal" to DCA.[19]  Second, while the present
appeal was pending, this court decided the case of *Boston
Housing Authy.* v. *Hemingway, ante,* 184.  The decision
defines the rights of tenants under residential leases.  It
elucidates and, in a number of ways that need not be re-
counted here, strengthens the remedies of tenants for
failure of a landlord to keep the rented premises in a
proper state of repair.  These remedies are no less avail-
able to tenants in public housing accommodations than to
those in private dwellings.  Third, just before the pres-
ent appeal was lodged, a specialized court, the Housing
Court of the City of Boston, was established by statute,
G. L. c. 185A, effective January 1, 1972, to handle all
criminal and civil matters regarding housing that arise
in the city of Boston.[20]  The jurisdiction of the Housing
Court is concurrent with that of the District and Supe-
rior Courts and actions within that jurisdiction pending
in either of the latter courts may be transferred by any
party to the Housing Court.  § 22.  One of the tenants'
remedies enforceable in the Housing Court is that pro-
vided by G. L. c. 111, § 127H, inserted by St. 1965, c. 898,
§ 3, and as amended by St. 1972, c. 201: under certain
conditions a tenant, in case of a violation of the State
Sanitary Code found by the commissioner of housing
inspection to exist (or as to which an inspection has been
requested but not made), may apply for an order author-
izing payment of rent to the clerk of court, to be dis-
bursed to effectuate removal of the violation.  The court

---

[18] Effective February 22, 1973.

[19] The tenant's use of the grievance procedure is voluntary and
does not affect his possible resort to a court, but the local housing
authority is limited in the court proceedings to the grounds it relied
on in its proposed disposition of the tenant's grievance; if the authority
desires to rely on new grounds, the tenant is entitled first to attack
them in a renewal of the grievance procedure.

[20] This is a shorthand statement.  For the details, see G. L. c. 185A,
§ 3.

is also empowered to issue injunctions and appoint receivers.[21]   Rule 20 of the Preliminary Rules of the Housing Court of the City of Boston makes provision for class actions by tenants in appropriate cases.[22]   In their brief here, the plaintiffs sought to support the present suit by asserting that it was in effect, although not in name, a petition pursuant to § 127H.   The plaintiffs' reference to § 127H helps to make our point that the exceptional relief demanded by the bill may not be sought at this time because viable alternatives appear to exist; but the bill was not intended as a petition under § 127H and does not meet the requirements of that section.   The bill failed to describe any particular alleged Sanitary Code violations in any particular building so as to provide a starting point for the proceedings and determinations and orders for correction.   Cf. *Stone* v. *Springfield,* 341 Mass. 246, 248–250; *Greenberg* v. *Assessors of Cambridge,* 360 Mass. 418, 420–423.   And while the relief sought in a § 127H action is principally the elimination of particular violations of the Sanitary Code, the relief claimed in the present case was a continuing open-ended effort to apply a general standard.

The United States Court of Appeals for the District of Columbia Circuit has sustained a complaint on behalf of tenants seeking a declaration and injunction against governmental agencies — the National Capital Housing Authority and the United States Department of Housing and Urban Development (HUD) — with regard to their policies of physical upkeep of a Federally owned and

---

[21] We express no opinion as to whether a receiver may be appointed for a public housing development or any part of it.

[22] See also G. L. c. 111, § 127H (b), which speaks of authorizing "any or all tenants" to pay rents to the clerk.

The model lease under new regulations, see note 2, *supra,* obligates the local housing authority, after notice, to repair as quickly as possible all defects in leased premises which create an immediate and serious danger to life, health, or safety, or to provide suitable temporary accommodations satisfying the Sanitary Code; if neither remedy is forthcoming within seventy-two hours, the tenant's rent abates.   Other necessary repairs are to be made within twenty-one days after notice.   The tenant may petition a hearing panel for partial rent abatement if repairs are not made within this time period.

363 Mass. 745                                    755

W. Broadway Task Force, Inc. *v.* Commr. of Dept. of Comm. Affairs.

financed housing project in the District of Columbia. *Knox Hill Tenant Council* v. *Washington,* 448 F. 2d 1045 (D. C. Cir.) (one judge concurring and dissenting).[23] Possibly on the strength of the *Knox Hill* decision, the United States District Court for the District of Massachusetts has sustained a similar complaint by tenants against the Secretary of HUD, the United States Housing Authority, and the members and executive director of BHA, relating to certain Federally financed housing projects in Boston.[24] The court in the *Knox Hill* case was less disposed than we are, upon a motion to dismiss the plaintiffs' pleading, to look ahead to the probable difficulties of affording effective remedies, that is, to inquire whether there was an apparent want of equity for the allowance of declaratory or injunctive relief. We do not, however, read that decision as necessarily at variance with ours, for there are differences that might well tip the scales. Thus it appeared that the sanctions of the District of Columbia Housing Regulations (comparable to our Sanitary Code) did not extend to and could not be enforced against the officials of the National Capital Housing Authority. If that was the case, there was greater need in the *Knox Hill* case for independent relief as envisaged in the tenants' complaint.[25]

The dismissal of the present suit is affirmed on the ground that the bill does not present a proper claim for judicial relief. See *Greenberg* v. *Assessors of Cambridge,* 360 Mass. 418, 423. This disposition is without prejudice to the commencement of a suit for similar relief predicated upon a showing that other expedients available to the plaintiffs have proven inadequate.

*Interlocutory and final decrees affirmed.*

---

[23] We are informed that the case was later settled.

[24] *Boston Pub. Housing Tenants' Policy Council, Inc.* v. *Romney,* Civil No. 70–1626–F, filed November 18, 1970, and still pending.

[25] The court noted that the Federal Administrative Procedure Act contains "expansive" provisions for judicial review of administrative action. 448 F. 2d at 1058, n. 16. See 5 U. S. C., § 702 (1970): "A person suffering legal wrong because of agency action . . . is entitled to judicial review thereof." Our State Administrative Procedure Act has no such statement. Compare n. 9, *supra.*